No. 27,810.

THE ELECTRIC SERVICE COMPANY, *Appellee*, v. THE CITY OF MULLINVILLE, *Appellant*.

(262 Pac. 536.)

SYLLABUS BY THE COURT.

1. LANDLORD AND TENANT — *Lease of Transmission Line with Agreement to Maintain—Liability for Expense of Removing and Rebuilding.* The city of Mullinville, in Kiowa county, constructed a transmission line from Bucklin, in Ford county, to Mullinville for the purpose of supplying the inhabitants of Mullinville with electric light, heat and power, and constructed a distribution system within the city. The entire .plant was leased to a service company for operation, and the service company agreed to maintain the transmission line. The line was constructed on a public highway. The board of county commissioners of Kiowa county, desiring to improve the highway, ordered the line removed, and widened the highway. Pursuant to the order, the line was removed, and was rebuilt on the addition to the highway made by widening it. *Held,* the expense of removing and rebuilding the line should be borne by the city.

2. SAME—*Funding and Computation of Interest on Expense of Rebuilding.* In view of the plan of financing the enterprise by which the city obtained electrical service, the expense of removing and rebuilding the transmission line

Electricity, 20 C. J. p. 320 n. 21. Landlord and Tenant, 35 C. J. p. 1176 n. 14; 36 C. J. p. 145 n. 46. Maintain, 38 C. J. pp. 335 n. 64, 336 n. 1.

should be funded and should bear interest the same as original construction cost and cost of making extensions within the city.

Appeal from Kiowa district court; KARL MILLER, judge. Opinion filed January 7, 1928. Modified and affirmed.

O. G. Underwood, of Greensburg, for the appellant.

Albert Watkins and Arthur C. Scates, both of Dodge City, for the appellee; Charles L. Hunt, of Concordia, T. F. Doran, Clayton E. Kline, both of Topeka, and A. Z. Patterson, of Kansas City, Mo., of counsel.

The opinion of the court was delivered by

BURCH, J.: The action was one by the lessee of an electric transmission line to recover from the lessor the cost of removing the line from its established location, pursuant to order made by public authority, and rebuilding it at another place. A demurrer was sustained to defendant's answer, and defendant appeals.

The city of Mullinville constructed a transmission line extending from Bucklin, in Ford county, to Mullinville, in Kiowa county, for the purpose of supplying inhabitants of Mullinville with electric light, heat and power. The cost of building the transmission line and building the distribution system within the city was met by a bond issue, and the entire plant was leased to the service company for operation for a rental sufficient to pay interest on the bonds. The cost to the city of future extensions in the city was likewise to be capitalized and bear interest at the rate of five per cent per annum, to be paid by the lessee. The lease was for a term of fifteen years, required the lessee to exercise the highest diligence to maintain uninterrupted service, required the lessee to keep the city harmless from loss, expense or damage to person or property occasioned by operation and maintenance, and contained the following provision:

"And during all said time the said company shall maintain the transmission line from Bucklin to Mullinville in good operating condition, and shall also maintain the present lighting distribution system in said city and such additions as shall be made thereto from time to time for any of the purposes included in this contract. The maintenance of all such equipment to be such as to furnish a good and sufficient lighting system for said city and its inhabitants."

The transmission line was constructed on U. S. highway No. 54. The board of county commissioners of Kiowa county undertook to improve the highway, and in order to do so widened it. The im-

provement made it necessary that the transmission line should be removed from the old highway the entire distance from Mullinville to the county line. Pursuant to order of the board of county commissioners the transmission line was removed and was rebuilt on the addition made to the highway by widening it. The electric company did the work under agreement with the city that the question who should bear the expense should be subsequently determined.

The trouble began in England in 1647, with the decision in the case of *Paradine v. Jane,* Aleyn, 26. In that case a tenant who had covenanted to repair, resisted payment of rent on the ground Prince Rupert, an alien enemy with a hostile army, had kept him out of possession. It was said that when a party by his own contract creates a duty or charge upon himself, he is bound to make it good, if he may, notwithstanding any accident by inevitable necessity, because he might have provided against it by his contract; and if the lessee covenant to repair a house, though it be burnt by lightning or thrown down by enemies, yet he ought to repair it. The ghost of *Paradine v. Jane* has long since ceased to walk in England (Evolution in the Law of Contracts and the Covenant to Repair, 144 The Law Times, 418), and was laid in this state by the opinion by Mr. Justice Brewer in the case of *Whitaker v. Hawley,* 25 Kan. 674, followed in *Saylor v. Brooks,* 114 Kan. 493, 220 Pac. 193. In the opinion in the case of *Baily v. De Crespigny,* 4 Q. B. 180 (1869), it was said:

"We have first to consider what is the meaning of the covenant which the parties have entered into. There can be no doubt that a man may by an absolute contract bind himself to perform things which subsequently become impossible, or to pay damages for the nonperformance, . . .

"But where the event is of such a character that it cannot reasonably be supposed to have been in the contemplation of the contracting parties when the contract was made, they will not be held bound by general words which, though large enough to include, were not used with reference to the possibility of the particular contingency which afterwards happens." (p. 185.)

In the opinion in the case of *Whitaker v. Hawley,* 25 Kan. 674, the court referred to the old common-law doctrine, and said:

"It assumes that which is not generally true, and ignores that which is ordinarily the underlying fact. A man leases, and contracts to pay rent. He puts no limitations or conditions in his contract. Therefore the courts should insert none, and should hold him to the very letter. He knew of the possibility of destruction by fire, and if he purposed to pay only until such destruction, he should have inserted a stipulation accordingly. Omitting any such stipulation he intended no such limitation, but meant himself to assume the risk, and

contracted for rent during the entire term. Now this argument is clear and strong, and, if we abide by the letter of the contract, unanswerable. But this assumes, what is not generally true, that the matter of fire enters into the thought of the parties. In nine cases out of ten the possibility of fire is not contemplated. A party sees a store suitable for his business or a house pleasant for a home, and if time and terms are satisfactory, he leases. Often no written contract is signed. And when a written lease is prepared he looks simply to the amount of rent and the length of the term named. He may indeed examine it to see that nothing objectionable is inserted, but he seldom notices the omission of a stipulation for which there is apparently no present need. Destruction by fire is an unthought-of contingency. The fact is, the parties negotiate for the possession of the building during the entire term. This underlies the whole thought of lease, just as fully as when they negotiate for the hiring of a horse, or a steamboat, or any other chattel. If fire is thought of, it will be mentioned, and if it is not mentioned, it is because it is not thought of, and because they are negotiating for a mutually understood coterminous occupation and rent. Now to ignore these facts, which actually underlie the contract and are the very basis upon which it is made, will practically work out injustice, no matter how beautiful and symmetrical the legal structure we erect thereon." (p. 684.)

In this instance the contract was to maintain the transmission line. What did the parties have in mind?

The ordinary meaning of the word "maintain" is to keep in a particular state or condition, especially with reference to efficiency; to support, to sustain, to keep up; not to suffer to fail or decline. (Webster's New International Dictionary.) The transmission line was completed and in existence on the public highway when the contract was signed, and there is nothing to indicate the location was not regarded as permanent. The nature of the contract clearly indicates that good operating condition, such as would furnish a good and sufficient lighting system, was the specific character of maintenance contemplated. Demolition of the line and reconstruction at another location is something quite different from keeping it up to a standard of efficiency, and it is scarcely reasonable to extend the meaning of the word "maintain" to include such a remote and extraordinary contingency as that occasioned by the removal order.

Neither the provision of the contract relating to diligence to prevent interruption of delivery of current, nor the provision relating to saving the city harmless from consequences of operation and maintenance, is interpretative of the word "maintain." One provision relates merely to effort to make the line as constructed deliver continuously the current it was built to deliver, and the other relates to the maintenance contracted for.

It would not be profitable to undertake an extensive review of the authorities. The city relies on the decision in the case of *Railroad v. Iron Co.*, 118 Tenn. 194. One of the headnotes sufficiently indicates the nature of the decision:

"A contract for the construction and operation of a branch railway from complainant's railroad to defendant's mines provided that defendant should build the substructure and complainant should build the superstructure and 'maintain and operate' said branch railroad. The railroad was built accordingly, and was operated for a time, but a bridge erected by defendant, under its contract to build the substructure, was washed away by an extraordinary freshet. *Held,* that complainant was obligated to reconstruct the bridge, under its contract to 'maintain' said branch railway, though the bridge, when erected, would become defendant's property—the contract providing that the substructure shall remain defendant's property." (p. 195.)

The service company relies on the case, among others, of *Herald Square Realty Co. v. Saks & Co.*, 215 N. Y. 427. In that case, the subject of the lease was a building at the corner of Broadway and Thirty-fourth street, in New York City. The building was constructed in such a manner that display windows projected on the streets. The tenant covenanted to keep the premises in good order, condition, and repair, and covenanted to comply at its own expense with municipal regulations. The lease was for a term of twenty years and six months. When the lease was executed the municipal authorities sanctioned and licensed show windows projecting on streets of the city. Eight years later a change in municipal policy occurred, and the proper board directed that such encroachments be removed. Compliance with the order made necessary important and permanent structural changes in the building. Construing the nature of the lease in the light of regulations, customs and usages contemporaneous with its execution, the court held it was not the purpose to subject the tenant to the expense caused by the extraordinary and unforeseen alterations made necessary by the radical change in municipal policy.

Applying the sensible, practical, realistic method of interpretation adopted in *Whitaker v. Hawley*, 25 Kan. 674, the court concludes that if it had been the intention of the parties to the contract under consideration to provide for removal of the transmission line from its established location and reconstruction at another place, they would have done so by inserting a clear provision to that effect in the lease. They would not have rested a matter so unusual, extraor-

dinary and important upon a term which exactly covered what they did have in mind—keeping up the line as it was established when the contract was made. Because the lessee did not contract to bear the unforeseen expense, it must be borne by the owner of the line.

In view of the plan of financing the enterprise by which the city was to obtain electrical service, the expense of complying with the order of the board of county commissioners should be regarded as construction cost, and should be funded and bear interest, the same as original cost and extension cost. The judgment of the district court is modified to include a proper order to this effect; otherwise the judgment is affirmed.

JOHNSTON, C. J., and MARSHALL, J., dissent from the first paragraph of the syllabus and the corresponding portion of the opinion.

BURCH, J. (dissenting in part): I do not see why the service company should pay interest on the money which it expended when the city must make good the expenditure. Therefore I dissent from the second paragraph of the syllabus and the corresponding portion of the opinion. I am authorized to say that Mr. Justice Hutchison concurs in this dissent.