[L. A. No. 14946. In Bank.—March 26, 1935.]

DANIEL VAN ALLEN BOSQUI, Jr., et al., Appellants, v. CITY OF SAN BERNARDINO (a Municipal Corporation) et al., Respondents.

(Two Cases.)

748

Swing & Swing for Appellants.

William Guthrie, City Attorney, Wardell D. Evans, Deputy City Attorney, Robert Brennan, M. W. Reed, Leo E. Sievert and H. K. Lockwood, for Respondents.

THE COURT.—A hearing was granted in this case after decision by the District Court of Appeal, Fourth Appellate District. Upon further consideration we adopt the opinion of Mr. Justice Marks as part of the opinion of this court. It reads as follows:

"The plaintiffs are the adult children of Daniel Van Allen Bosqui and Mary Bosqui, his wife, who were killed in an automobile accident at about noon on the 17th day of April, 1932. For the sake of brevity we will refer to the City of San Bernardino as the City, and to The Atchison, Topeka and Santa Fe Railway Company as the Company.

"The plaintiffs filed separate actions for damages resulting from the death of each parent. They were consolidated for trial and come here on one record. At the close of plaintiffs' case the trial court granted a nonsuit and the judgment thereafter entered is now before us for review.

"The fatal accident occurred on an overhead crossing which is popularly known as a viaduct built over the tracks of the Company. The history of the construction of the original viaduct, and its extension (describing only a portion thereof) and proceedings before the Railroad Commission, are described by the Supreme Court in the case of *City of San Bernardino* v. *Railroad Commission*, 190 Cal. 562 [213 Pac. 980], as follows:

" 'In 1907, and for a long time prior thereto, Mt. Vernon avenue was a public highway in the City of San Bernardino, which was crossed, at grade, between Third street and Fourth street, in said City, by three or more tracks of the railway company. The latter being desirous of laying additional tracks to extend its switching yards, entered into negotiations with the city authorities which resulted in an agreement or understanding to the effect that the city should vacate that portion of Mt. Vernon avenue between Third and Fourth streets, in consideration whereof the railway company should erect over the portion thus vacated a viaduct for highway purposes, on condition that the city should thereafter maintain the same "so long as the same shall be used by the public for travel thereon". This agreement was carried out. The city by ordinance abandoned and vacated that portion of the highway, on the expressed con-

dition that the railway company should construct the viaduct in accordance with plans and specifications therein referred to, and when completed should convey the same to the city, "said deed or conveyance to be upon condition that the expense of maintaining said viaduct will thereafter be borne by said city". The viaduct was constructed and conveyed to the city by deed of conveyance containing the above-quoted condition, and the city by resolution accepted the same. Upon the completion of the viaduct there were fifteen tracks laid across the land which previous to the closing had been Mt. Vernon avenue. In 1916 the railway company, desiring to further extend its yards, negotiations resulted in a further agreement, or understanding similar to the first, as a result of which an additional portion of Mt. Vernon avenue was vacated by ordinance. The railway company constructed an addition to the viaduct, extending the same approximately three hundred feet farther south, and conveyed the extension thereof to the city by deed. With respect to this extension, however, so far as the evidence discloses, nothing was said, either orally or in writing, upon the subject of the cost of future maintenance thereof. After the completion of the extension to the viaduct there were approximately thirty-eight tracks crossing thereunder. The viaduct consisted of a steel structure with a wood floor, constituting an elevated highway about twenty feet in width, in addition to the sidewalk thereon, and at a height sufficient to permit the operation of trains underneath. In 1920 the plank roadway of the old portion of the viaduct was, and for three years had been, very badly out of repair, so much so that it constituted a danger to traffic passing over it.

" 'In this situation the railway company filed an application before the Railroad Commission setting forth the facts above outlined and praying that the commission after a hearing "make such orders and directions with respect to the maintenance and care of said viaduct as may be just". The city filed an answer and an amendment thereto, substantially admitting the facts alleged in the petition, but denying the jurisdiction of the Railroad Commission in said matter, and alleging that the city had no power or authority to enter into the agreement therein referred to for the maintenance of the viaduct by it. After hearings therein the commission made the order which is now up for review,

wherein it found as a fact that public safety, convenience, and necessity require the maintenance and repair of the viaduct, and require the making of an order apportioning the cost of such maintenance and repair between the railway company and the city, and ordered that the railway company shall maintain ''at its sole cost and expense'' the new portion of the viaduct, and that the city shall maintain ''at its sole cost and expense'' the old portion thereof.'

''To the foregoing description of the viaduct as constructed in 1916, we must add a description of that portion over what is now Third street in the City. The original viaduct was extended south beyond the boundaries of Third street to, or near, the line of Broadway, and is described in the above-quoted paragraphs of the Supreme Court opinion in the case of *City of San Bernardino* v. *Railroad Commission*, *supra*. Third street was relocated and bore southerly and probably into what had been Broadway. At its southerly extremity the new portion of the viaduct was extended in a turn to the east for about six hundred thirty-one feet where, descending a six per cent grade, it ended in Third street as relocated. While the main portions of the viaduct on Mt. Vernon avenue and Third street approached each other at an angle of ninety degrees, the actual junction did not form a right angle. A short distance before the viaduct's west line on Mt. Vernon avenue would have joined with its south line on Third street, its direction was broken by a deflection of approximately forty-five degrees to the east for a distance of thirty-seven feet, where it joined the south line of Third street a few feet east of the east line of the Mt. Vernon portion of the viaduct produced southerly across the end of the Third street portion. There is a similar deflection at the south end of the east line of the Mt. Vernon avenue portion of the viaduct for twenty-three feet, although at a different angle, which forms the extreme east end of the north line of Third street portion of the viaduct. This north line proceeds easterly with two slight changes of direction for about fifty feet to where it joins the regular north line of the Third street portion of the viaduct, where, as on Mt. Vernon avenue, the roadway is twenty feet wide with a six-foot sidewalk for pedestrians on the south and west sides. This construction gives a roadway on the turn with a maximum width of thirty-two feet. The roadway of

the main or level portion of the viaduct is thirty-two feet above the ground.

"While the terms of the order of the Railroad Commission under review in the case of *City of San Bernardino* v. *Railroad Commission, supra,* were sufficiently set forth for the purpose of that case, the details of the order not having been under attack, as the sole question decided was the power of the commission to make any order apportioning the cost of maintaining the viaduct, they become important here. The order made was as follows:

" 'Public hearings having been held upon the above-entitled application, briefs having been filed subsequent to the hearings, the matter having been submitted and is now ready for decision,—

" 'It is hereby found as a fact, that public safety, convenience and necessity require the maintenance and repair of the overhead crossing or viaduct over the tracks of The Atchison, Topeka and Santa Fe Railway Company at Mt. Vernon Avenue, in the City of San Bernardino;

" 'It is further found as a fact, that public safety, convenience and necessity require that an order be made by this Commission apportioning the cost of such maintenance and repair between The Atchison, Topeka and Santa Fe Railway Company and the City of San Bernardino, in accordance with the order hereinafter contained; and basing its order upon the foregoing findings of fact and upon the opinion preceding this order,

" 'It is hereby ordered that the cost of maintenance of the overhead crossing or viaduct over the tracks of The Atchison, Topeka and Santa Fe Railway Company at Mt. Vernon Avenue in the City of San Bernardino be borne as follows, to-wit:

" '1. Applicant shall maintain, at its sole cost and expense the new level portion of said viaduct, as shown outlined in red, and marked "Level" on applicant's Exhibit No. 1, otherwise described as that portion of said viaduct extending along Mt. Vernon Avenue from a point 513 feet south of the south line of Fourth Street to a point 39 feet north of the north line of West Broadway.

" '2. The City of San Bernardino shall maintain, at its sole cost and expense, the old level portion and both sloping approaches to both old and new level portions, as shown on

applicant's Exhibit No. 1, otherwise described as that portion of said viaduct not herein ordered to be maintained by applicant.

" '3. The word "new" as used above in this order, refers to those portions of said viaduct constructed in or subsequent to the year 1916.'

"The meaning of the foregoing is made somewhat uncertain by the fact that while a copy of exhibit No. 1, which is there referred to, is represented in the record here by a photograph of the original, no portion of it is outlined in red. The new level portion extended around the turn from the north and south portion on Mt. Vernon avenue a distance of about twenty-five feet to meet the incline approaching it on Third street. Without the red outlining it is not as clear as it should be that the order of the railroad commission placed the duty of maintaining this particular twenty-five feet of the viaduct on the Company. It was probably within the exterior boundary lines of Mt. Vernon avenue existing prior to the abandonment of portions of that street. As the case was tried upon the theory that the order placed the obligation of maintaining this part of the new level portion of the viaduct upon the Company and this position is not questioned in its brief, we will assume that this particular twenty-five feet was included within the description in the order of that portion to be maintained by the Company.

"Along the east and north sides of the viaduct guard rails were constructed by mounting three-inch pipes as upright posts into which were fastened three lateral pipes serving as rails. The upper pipe was three inches and the other two were two inches in diameter. A further guard was furnished by bolting four by six inch Oregon pine timbers to the floor of the viaduct along the north edge of the Third street portion. The timbers were so placed that the four-inch dimension rested on the floor.

"As a further protection to the traveling public using the roadway a curbing had been constructed along the roadway edge of the sidewalk along the entire turn. Four by eight-inch Oregon pine timbers were fastened along the upper outer edge of the sidewalk and these timbers and the sidewalk were faced on the roadway edge with timbers of three by twelve-inch Oregon pine, so that when these

timbers were newly installed they presented a vertical, solid twelve-inch obstruction to vehicular traffic which might be inclined to mount onto the sidewalk. At one time sixteen-inch facing timbers had been used, but at and before the time of the accident here in question the twelve-inch timbers were in place. For lack of better names we will refer to all of these timbers resting on and along the face of the sidewalk as a curbing and the three by twelve-inch timbers as the facing.

"It does not appear from the record whether the curbing was part of the original construction of the viaduct and if not when or by whom it was installed. The City repaired and replaced timbers of the curbing several times between June 1, 1929, and June 1, 1931.

"There were two warning signs that could be observed by travelers crossing the viaduct from the north. One was a sign about twenty by twenty inches attached to an iron pipe ten feet high with 'SLOW LEFT' and an arrow pointing to the left upon its face. It was about two hundred seventy-one feet north of the turn. The other was an electric 'blinker' with a red glass lens about four inches in diameter placed in the center of the south end of the Mt. Vernon avenue portion of the viaduct. The light was illuminated about three times each minute. Besides these two signs, photographs introduced in evidence show that the entire portion of the viaduct from the level of Third street to the turn was clearly visible to an automobile driver traveling south on the viaduct for a considerable distance before he reached the turn.

"The viaduct accommodated vehicular traffic to the extent of between a minimum of two thousand one hundred and eleven, and a maximum of four thousand four hundred ninety-six automobiles each day.

"Considerable sand, gravel, wood splinters and other debris continually accumulated on the west and south side of the roadway, along the turn and to the north and east of it. Between June 1, 1929, and June 1, 1931, employees of the City had cleaned off this debris at intervals. On the day of the accident it had accumulated in such quantities that it completely covered the portions of the west and south side of the roadway in the turn and in places extended several feet outward from the curbing.

"The entire curbing was badly worn and splintered and in a very dilapidated condition on the day of the accident. This was caused by the wheels of vehicles hitting and rubbing against it in making the turn. The east-most timbers of the curbing, the ones involved in this accident, were particularly dilapidated. The four by eight-inch timber resting on the top of the sidewalk was badly splintered. The facing timber had been so worn that its top and front sides formed an oval instead of joining in a rectangle. Its east end had been completely worn away for a portion of its original length. Long splinters had been torn from it and many protruded from its side, all pointing westerly.

"Daniel Van Allen Bosqui and his wife Mary were on a journey from Seattle, Washington, to Baltimore, Maryland, on the day on which they were killed. They were traveling in a 1929 model Hupmobile eight-cylinder sedan that had a wheel base of one hundred thirty-two inches. The tragedy was observed by one witness who testified at the trial. He was approaching the viaduct, traveling west on Third street. His testimony may be summarized as follows:

"He saw a procession of about fifteen cars traveling south on the Mt. Vernon avenue portion of the viaduct led by the Hupmobile, which came to a complete stop when a few feet north of the entrance to the turn. Two cars were traveling west on the Third street portion of the viaduct with the leading car, a large one, near the turn. The Hupmobile started and again came to a complete stop at about the middle of the turn close to the curbing. At that time the leading westbound automobile was directly opposite in the turn on its own right-hand half of the roadway. The Hupmobile started again and after proceeding a few feet it was suddenly tilted with its right front wheel elevated above the roadway. At this point it either came to a stop or was practically stopped. Its wheel suddenly came down from the elevation and the automobile proceeded at a speed of six or seven miles an hour across the roadway in a northeasterly direction, crashed through the guard rails on the north side of the viaduct and fell to the ground below, killing Mr. and Mrs. Bosqui.

"An officer, a member of the California Highway Patrol, furnished the only other direct evidence bearing upon the causes of the accident. He arrived at the scene shortly

after the crash and inspected the roadway and automobile which was lying on its crushed top with the wheels in the air. There was a smear of red about a foot long on the curbing on the level portion of the viaduct about six or eight feet west of where the incline from Third street joins the level floor. (The Hupmobile wheels were painted red.) Slivers of wood which were newly torn from the facing, were on the roadway, one of them being about one foot long. Directly opposite this point was a skid mark about one foot long and about forty inches from the face of the curbing presumably made by the left front tire of the Hupmobile. Extending back and northerly for about sixty feet was a distinct track of an automobile tire in the debris. The north end of the track started about two feet from the west curb on the Mt. Vernon avenue portion of the viaduct and proceeded on a curve to the east, ending where the red appeared on the facing. About thirty feet east from the east side of the Mt. Vernon viaduct and on the north side of the incline to Third street one of the guard timbers had been torn out, together with four upright iron pipes and their connecting pipes. The Hupmobile lay on the ground directly beneath this break. A number of slivers of Oregon pine were forced between the tire and the rim of the right front wheel of the Hupmobile.

"The Hupmobile was driven after the accident and its working parts were found to be in good order with the wheels in line and the brakes properly adjusted.

"It should be observed that the debris on the roadway over which the Hupmobile passed and the dilapidated timbers of the curbing with which the wheel of the automobile came in contact and mounted were on the portion of the viaduct to be maintained by the Company and the guard rail through which the automobile crashed was on that portion to be maintained by the City under the order of the Railroad Commission as we have interpreted it on this appeal under the evidence before us.

■ "Any liability of the Company must arise under the order of the Railroad Commission requiring it to maintain the new level portion of the viaduct at its own cost and expense. This obligation was placed upon it by the order which the Supreme Court has held the Railroad Commission had the power and authority to make. (*City of San Ber-*

*nardino* v. *Railroad Commission, supra*.) ▮ While the word 'maintain' is used in the formal portion of the order, it is clear from what precedes that it was intended that this maintenance should include keeping the viaduct in a proper state of repair. The supreme court of Kansas in a case construing a contract requiring an electric service company to maintain a transmission line, said: 'The ordinary meaning of the word "maintain" is to keep in a particular state or condition, especially with reference to efficiency; to support; to sustain, to keep up; nor to suffer to fail or decline.' (*Electric Service Co.* v. *City of Mullinville*, 125 Kan. 70 [262 Pac. 536]; see, also, *Davis Holding Corporation* v. *Wilcox*, 112 Conn. 543 [153 Atl. 169]; *Plimpton* v. *New York, N. H. & H. R. R. Co.*, 221 Mass. 548 [109 N. E. 732]; *Board of Education of Earlville Community High School Dist. No. 380* v. *Board of Education of Non-High School Dist. of La Salle Co.*, 343 Ill. 464 [175 N. E. 810].) The duty to maintain and keep in repair related to the structure itself and included a duty to repair or replace weakened or worn portions of the framework, roadway, curbing or sidewalk. It could hardly include the duty to keep the roadway clean and free of foreign substances. Street sweeping is a work which pertains more to the convenient use, good appearance and sanitary condition of a roadway or causeway than the maintenance of its integral parts or of the whole structure. The duty to maintain a portion of the viaduct would hardly include a duty to keep the roadway clean and to remove sand, gravel and other debris falling upon it. The duty to keep the roadway clean rests upon the City as the viaduct was part of its system of public streets. (*City of San Bernardino* v. *Railroad Commission, supra*, at p. 568.)

▮ "The liability of the City must arise under the provisions of an act of the legislature which we will term the Public Liability Act. In *Pittam* v. *City of Riverside*, 128 Cal. App. 57 [16 Pac. (2d) 768], it was said: 'This action was brought under the provisions of section 2 of an act of the legislature approved June 13, 1923 (Stats. 1923, p. 675). Under this section of the act municipalities are made liable for injuries to property resulting from the dangerous or defective condition of public "grounds, works and property in all cases where the governing or managing

board . . . or person having authority to remedy such condition, had knowledge or notice of the defective or dangerous condition of any such . . . grounds, works or property and failed or neglected for a reasonable time after acquiring such knowledge or receiving such notice, to remedy such condition or failed and neglected for a reasonable time after acquiring such knowledge or receiving such notice to take such action as may be reasonably necessary to protect the public against such dangerous or defective condition.'' ' . . .

''Under the provision of that portion of section 2 of the act, which we have just quoted, the following conditions must exist to support the judgment of the court below: (1) The injuries to respondent through the destruction of his personal property must have resulted from a dangerous or defective condition of the dumping ground; (2) the city council of the City of Riverside, or some officer or person having authority to remedy such condition, must have had notice or knowledge thereof; (3) it, or he, must have failed or neglected to remedy such dangerous or defective condition within a reasonable time after acquiring such knowledge or receiving such notice; or, (4) must have failed to take such action as might be reasonably necessary to protect the public against such dangerous or defective condition within a reasonable time after such knowledge or notice.'

''The question arises: What effect did the order of the Railroad Commission placing the responsibility of maintaining the new level portion of the viaduct upon the Company have on the liability of the City for injuries caused on that portion, by its dangerous or defective condition? We conclude that it had none. The entire viaduct remained a public street of the City. The City has control over its streets and has both the power and the duty of keeping them in repair. Under the terms of the Public Liability Act the City is made responsible for injuries resulting from their dangerous and defective conditions under the limitations we have outlined. The order of the Commission did not purport to relieve the City of this duty and liability, assuming, but not holding, that it might have done so. It merely placed an added duty upon the Company without relieving the City from any of its duties or liabilities. It left the Company liable with the City for damages resulting from their separate obligations arising on the part of

the one under the order of the Railroad Commission and the other under the terms of the Public Liability Act.

■ "The rules governing us in reviewing a judgment entered after granting a motion for nonsuit are clearly stated in *Berger* v. *Lane*, 190 Cal. 443, at page 452 [213 Pac. 45, 49], as follows: 'Every favorable inference fairly deducible and every favorable presumption fairly arising from the evidence adduced must be considered as facts proved in favor of the plaintiffs. Where evidence is fairly susceptible of two constructions, or if one of several inferences may reasonably be made, the court must take the view most favorable to plaintiffs. If contrary evidence has been given it must be disregarded. (*Estate of Arnold*, 147 Cal. 583 [82 Pac. 252].) The plaintiff must also be given the benefit of every piece of evidence which tends to sustain his averments, and such evidence must be weighed in the light most favorable to plaintiff's claim. (*Anderson* v. *Wickliffe*, 178 Cal. 120 [172 Pac. 381].) Evidence, whether erroneously admitted or not, if relevant to the issues joined, must be given the credit and benefit of its full probative strength, and any question arising from the fact of variation between the evidence of the witnesses cannot be raised or considered. The evidence must be taken most strongly against the defendant, and if the plaintiff has introduced proof sufficient to make out a *prima facie* case under the allegations of his complaint the motion, if made upon the close of the case, should be denied.'

■ "From the evidence in this case the jury might have drawn the conclusions that the deceased persons were traveling south on their right-hand side of the viaduct at a prudent and safe speed and as they entered the curve a large sedan was approaching the curve from the east; that this required the driver of the Bosqui car to approach close to the curb on his right; that large splinters projecting from the facing came into contact with the front portion of the right front wheel and were forced into it between the tire and the rim; that this caused the wheel to cramp to the right and mount the curving and broken side of the facing and mount the curbing. It should be observed that the skid mark made by the left front wheel of the Hupmobile was only forty inches from the curbing, which was eleven inches in thickness before it was worn by traffic. This would make

the left front wheel about fifty-one inches from the sidewalk side of the curbing or less than the standard tread of an automobile. The jury might have concluded that the right front wheel crossed the curbing and dropped onto the sidewalk on its inside; that the driver had the car in one of its lower gears as he had come to a stop shortly before; that to extricate himself from this difficulty with his front wheels astride of the curbing and the right resting on the sidewalk behind a timber four inches high he opened his throttle; that the wheel climbed the obstruction and dropped from the curb onto the roadway; that to complete this maneuver he had to cramp the front wheels to the left; that the impetus given by forcing the wheel over the obstruction and its dropping onto the roadway from a twelve-inch curbing with one of the lower gears engaged caused the car to rapidly follow the direction of the cramp of the front wheels; that the jar caused by the drop from the curbing might have displaced the driver from the position where he had complete control of his vehicle; that before he could regain control of the car, it crashed through the north guard rail to the street below.

"This is but one of several inferences that might be drawn from the evidence, but is one that we feel is justified and is favorable to the case of appellants. From it the conclusion may be drawn that the accident would not have happened but for the splinters entering the wheel and pulling its front sharply to the right where it mounted the curving face of the curbing instead of sliding along it as might have happened had the facing timber not been worn into an oval shape. This disposes of the contention that the evidence demonstrates that the condition of the curbing could not have been a proximate cause of the accident.

■ "The evidence shows that many motor vehicle accidents, some of them involving deaths, had happened at this particular curve prior to the one involved here. This was well known to the responsible officers of the City, including its mayor. It was also known to the street superintendent that the planks and timbers forming the curbing were rapidly worn away by vehicles coming in contact with them. This constituted sufficient notice of the condition to the officers of the City. (*Boyce* v. *San Diego High School District,* 215 Cal. 293 [10 Pac. (2d) 62]; *Magnuson* v. *City of*

*Stockton,* 116 Cal. App. 532 [3 Pac. (2d) 30].) There is nothing to show that the City had taken any action immediately prior to the accident to remedy the dangerous or defective condition, if one existed. We believe that the question of whether the condition of the roadway was dangerous or defective should have been left to the jury for determination.

"Both respondents urge that the driver of the Bosqui car was guilty of contributory negligence as a matter of law, this being the principal defense of the Company. They urge that after the right front wheel had mounted the curb and the car was stopped it was in a position of safety; that the driver caused it to leave this position and to proceed across and off the viaduct without the use of ordinary care or prudence. Under the conditions presented here we are required to resolve all reasonable inferences to be drawn from the evidence in favor of appellants. The question of the prudence of the actions of the driver after the right front wheel of the Hupmobile mounted or crossed the curbing is one upon which reasonable minds might well differ. Ordinarily the question of contributory negligence is one for the trier of fact in motor vehicle cases. In *Mast* v. *Claxton,* 107 Cal. App. 59 [290 Pac. 48], it was said: 'No two cases of automobile collisions are exactly alike, and each must be decided upon its own state of facts. According to the well-settled law of this state, negligence is, generally speaking, a matter of fact, and the same is true of contributory negligence. Contributory negligence is a question of law only when the court is impelled to say that from the facts reasonable men can draw but one inference, and that inference points unerringly to the negligence of the plaintiff contributing to his injury.'

"The City urges that the Public Liability Act is unconstitutional and in violation of the provisions of section 11 of article I of the state Constitution, in that it gives a right of action against cities, counties and other such public agencies and not against the state for damages resulting from the dangerous or defective condition of public streets. The history of the immunity of a public agency against suit for an injury suffered while it was acting in its governmental capacity takes us back to that doctrine of the common law which gave the sovereign immunity from suit

upon the theory that 'it was the "right divine of kings to govern wrong"'. (*Chafor* v. *City of Long Beach,* 174 Cal. 478 [163 Pac. 670, Ann. Cas. 1918D, 106, L. R. A. 1917E, 685].) The doctrine is applied in California and no action is permitted against the state or its political subdivisions when acting in a governmental capacity without legislative consent for without such consent the wrong is without a remedy. A somewhat similar contention was made in the case of *Heron* v. *Riley,* 209 Cal. 507 [289 Pac. 160], where the constitutionality of section 1714½ of the Civil Code was considered. The Supreme Court said: ' "It is objected that the section is class legislation, in that it inures to the benefit of a favored class of citizens, that is, only those who are damaged through the negligent operation of automobiles owned by or used in the service of the state, and thereby makes a distinction in their favor as against citizens who may suffer damages through being injured by other state-owned and operated instrumentalities, and who are without recourse against the state because it has made no such remedial provision for them. This objection goes only to the policy of such legislation, and the wisdom of the legislature in enacting it. A right of action to one injured through the operation of an instrumentality used by the state did not exist at common law. It is not an inherent right, and exists only so far, and in favor of such persons as may be declared by the legislative power of the state. The provisions of the Constitution were not intended to make it necessary that the legislature, when conferring new rights of action upon particular classes of citizens for injuries not previously actionable, should, by the same act, declare that all persons who may suffer damages from injuries of that character shall also have such right of action. (*Pritchard* v. *Whitney Estate Co.,* 164 Cal. 564, 568 [129 Pac. 989].) Consequently, a law, to be general in its scope, need not include all classes of individuals in the state. It answers the constitutional requirements if it relates to and acts uniformly upon the whole of any single class of individuals or objects, and the classification is founded upon some natural, intrinsic or constitutional distinction. (*Abeel* v. *Clark,* 84 Cal. 226, 230 [24 Pac. 383] ; *People* v. *Jordan,* 172 Cal. 391, 397 [156 Pac. 451].) If good grounds for the classification exists, such classification is not void because

it does not embrace within it every other class which might be included.' We can find no merit in this argument of the City.''

The defendant City suggests that the Public Liability Act does not apply where the defective condition of the street or highway concurs with some other efficient cause or act of a third person to cause the injury. It is urged that a strict construction of the statute leads to this conclusion. The question is apparently new in this state. A few decisions from other jurisdictions support this view. See *Grenier* v. *Town of Glastonbury*, 118 Conn. 477 [173 Atl. 160]. Other courts hold the city liable in such a case. See *Beebe* v. *Scotts Bluff County*, 92 Neb. 501 [138 N. W. 737]; *David, Municipal Liability in Tort in California,* 7 So. Cal. Law Rev. 372, 440. In our opinion, where the thing exists which is denounced by the statute, namely, the neglect to remedy a dangerous or defective condition after knowledge thereof, and it proximately causes the injury, the City is liable under the clear meaning of the law despite the existence of another and concurring cause.

The judgment is reversed.

Rehearing denied.