[Civ. No. 21231.   Second Dist., Div. One.   Mar. 1, 1956.]

KENNETH D. HOLLAND et al., Appellants, v. ROBERT L. BRAUN et al., Respondents.

Kenneth D. Holland, in pro. per., for Appellants.

Roger Arnebergh, City Attorney (Los Angeles), Bourke Jones, Assistant City Attorney, and Weldon L. Weber, Deputy City Attorney, as Amici Curiae on behalf of Appellants.

Mitchell, Silberberg & Knupp, George Benedict, Jr. and Binford, Binford & McNabb for Respondents.

WHITE, P. J.—By deed dated August 31, 1949, and recorded September 2, 1949, Title Insurance and Trust Company conveyed a 40-foot nonexclusive easement for road

purposes to the record owners of the North Half of Section Two "abutting upon the easement hereby conveyed, in severalty, by the same tenure as they now hold said property of record." The deeds listed in said conveyance as showing the record owners are:

August 27, 1927, Instrument Number 382, to Otto J. Monson and Mary Monson, husband and wife, as joint tenants: "Also subject to 40 foot right of way along the bridle trail as now built."

August 3, 1934, Instrument Number 902, to Leland P. Reeder, a married man;

August 3, 1934, Instrument Number 453, to R. M. Norvell, T. H. Ramsay, G. B. Wilcox, L. L. McCoy, and F. A. Ellenwood, as Trustees;

August 3, 1934, Instrument Number 915, to T. H. Pickford, a widower, and Alma T. Gordon, a married woman, each an undivided one-half interest;

August 3, 1934, Instrument Number 925, to Helen Maynard Salisbury, a single woman;

Each of the above mentioned deeds of August 3, 1934, "Reserving a 40 foot right of way over and along the bridle path as now built connecting Benedict Canyon and Franklin Canyon, which said right of way is for use as a road by the owners of adjoining land and the public in general."

At the time of the trial, plaintiffs and defendants were the owners of the various parcels comprising said North Half of Section Two. The easement was surveyed in 1947 in accordance with the description contained in the deed from Title Insurance and Trust Company dated August 31, 1949, above referred to.

In 1946, some of the then owners voluntarily had the road graded to a width of 15 to 25 feet and oiled it, and in 1947 it was oiled again, at a total cost of $2,240.75. From 1947 to 1952, those property owners occasionally repaired the worst portions of the road by filling up holes and ruts.

In 1950, appellants purchased a home site on the easement, which will hereafter be referred to as "Oak Pass Road," and prepared plans and specifications for building a home there, but they did not then apply for a building permit.

In May, 1951, the Los Angeles Municipal Code was amended by adding to chapter one thereof, article 8—Private Street Regulations—which provides, in part, as follows:

Section 18.00. "Purpose—The purpose of this Article is to prescribe rules and regulations governing the platting

and division of lands as lots or building sites which are contiguous or adjacent to private streets; to provide for the filing and approval of 'Private Street Maps'; to require that lots or building sites which are contiguous or adjacent to private streets conform to the minimum requirements of Article 8 of Chapter 1 of this Code before permits shall be issued.

Section 18.03. "PRIVATE STREET MAP—

"(A) . . . every person applying for a building permit for a lot or building site contiguous or adjacent to a private street or private road easement . . . shall file with the commission . . . a 'Private Street Map' . . .

. . . . . . . . . . . .

Section 18.10. "BUILDING PERMITS—

"No building permits shall be issued for the erection of buildings on lots or building sites which are contiguous or adjacent to private streets unless the following requirements have been met:

"(A) That the Commission shall have approved the 'Private Street Map' and have made its written findings as to the conditions of approval thereof.

"(B) That the Director of the Department of City Planning shall certify to the Department of Building and Safety that the conditions, if any, required by the written findings of the Commission have been fulfilled in a satisfactory manner and that a permit may be issued."

In 1952, plaintiffs and some of the defendants (calling themselves "Oak Pass Property Owners Association") prepared and filed with the Planning Commission of the City of Los Angeles "Private Street Map No. 91." The planning commission approved the map subject to conditions that the road be widened and paved with rock and oil and that rolled curbs and culverts be constructed. November 3, 1952, plaintiff Kenneth D. Holland, for the Oak Pass Property Owners Association, executed a contract for the road work. At the commencement of this action the work (except storm drains) had been completed; and before the trial all the work had been completed, inspected and officially approved by the planning commission. As stated in Appellants' Opening Brief, ". . . The area is now eligible for building permits, and four have since been granted." The total cost of the work was $15,568.92. Certain defendants contributed $9,020 and the Department of Water and Power $1,500, leaving $5,113.42 still due the contractor.

Appellants and certain defendants who answered and joined in the prayer of the complaint sought by the instant action to force the noncontributing owners of lands contiguous to Oak Pass Road to pay their proportionate shares of the cost of such road work under section 845 of the Civil Code, which, so far as pertinent, reads as follows:

"The owner of any easement in the nature of a private right of way, or of any land to which any such easement is attached, shall maintain it in repair.

"If the easement is owned by more than one person, or is attached to parcels of land under different ownership, the cost of maintaining it in repair shall be shared by each owner of the easement or the owners of the parcels of land, as the case may be, pursuant to the terms of any agreement entered into by the parties for that purpose. In the absence of an agreement, the cost shall be shared proportionately to the use made of the easement by each owner.

"In the absence of an agreement, any owner of the easement, or any owner of land to which the easement is attached, may apply to the superior court where the right of way is located for the appointment of an impartial arbitrator to apportion such cost. If the arbitration award is not accepted by all of the owners, the court may determine the proportionate liability of the owners, and its order shall have the effect of a judgment.

"If any one of the owners of the easement or parcels of land fails, after demand in writing, to pay his proportion of the expense, an action may be brought against him in a court of competent jurisdiction by the other owners, either jointly or severally, for contribution."

In addition to the facts hereinbefore stated, the court found as to the ownership of the various parcels of land and of Oak Pass Road; that all of the defendants except Frank and Jane Girard "are required to use the improved portion of Oak Pass Road for ingress and egress; that Oak Pass Road was first constructed in 1917 as a bridle path, and about 1935 it was graded and widened to a roadway; that defendants McFarland built their home on said Oak Pass Road in 1937 and have lived there ever since; that between 1937 and the commencement of this action in 1953 homes were built thereon and occupied by defendants Ralph L. and Mildred B. Warner, Paul W. and Helen L. Colburn, William R. and Grace E. Brockbank, and Harold P. Calori.

The court further found: "It is true that from 1947 until and including through October, 1952, the condition of said roadway had deteriorated, was neither surfaced nor graded, was marred by numerous ruts, holes and ridges, narrow stretches and sharp turns, and during said times, in inclement weather, certain portions were passable but the road, as a whole, was impassable to vehicular traffic. As a result of said condition, said roadway was in great need of repair."

That certain named defendants "agreed, among themselves, to undertake a major improvement of said existing roadway consisting of grading, asphalt surfacing, widening, straightening and the installation of storm drains, and to defray the cost thereof by themselves and by contributions, *if obtainable,* from other property owners who use said road." (Emphasis added.)

That certain named defendants "have not contributed or paid any portion of the cost of said improvement."

From those and other facts, the court concluded "that the work performed on Oak Pass Road was a major improvement and did not constitute a repairing of said road, and that, therefore, the defendants . . . are not required to contribute to the cost thereof under the provisions of Section 845 of the Civil Code of the State of California, or under any other law or statute of the said State of California."

The city attorney of Los Angeles, in his brief as amici curiae in support of appellants, urges that if the judgment "that the improvements made constitute new construction and not maintenance and repair is allowed to stand," a substantial portion of the inhabitants of Los Angeles and other cities will be adversely affected. Their purpose in filing the brief is stated to be "to insure that the many private streets permitted within its (Los Angeles') boundaries will be maintained in such state of repair that new homes may be built thereon and the inhabitants thereof may receive police and fire protection as well as such city services as rubbish and garbage collection."

It is the contention of the city that the degree of repair required by its ordinance is the same as that required by section 845 of the Civil Code. That both the ordinance and the statute "were designed to prevent the creation of substandard communities and to encourage healthy growth of cities and towns. Yet under the judgment, if it is permitted to stand, a private street may be reduced to such state of disrepair that no new or additional building thereon will be

permitted, city services will be withheld, and adequate police and fire protection to the area will be denied. This is true because the record shows that the property owners did neglect Oak Pass Road until it was at times well nigh impassable as far as vehicular traffic is concerned.''

The evidence relied upon and referred to in support of the above statement in the city's brief is that during heavy rains certain portions of the road could not be traversed by automobiles; and on a few occasions through the years some of the residents of the area had to leave their automobiles and walk to their homes. There is no showing that Oak Pass Road had become either dangerous or impractical for the regular use of those who resided on it, or that the existing dirt road could not have been repaired at a lesser cost to its owners.

There is testimony that in front of the home of defendant Calori a tree was removed and the road was widened and paved making his home less pleasant to live in; that other trees were removed, the grade of the road was changed by cutting and filling, and that such work probably detracted from the values of the properties fronting upon those portions of the road. In their brief, respondents Frank and Jane W. Girard state: ''The area is and always has been a high class residential area and perhaps may deteriorate rather than benefit from appellants' so-called improvements and any proposed subdividing. Respondents Girard purchased this property because they loved the rustic neighborhood. The so-called improvements, to them, are harmful and imposed against their will and desire.'' However, no question concerning such detriment is raised on the instant appeal.

Upon stipulation of the parties, the court viewed the property and traversed the entire length of Oak Pass Road. The court's view of the premises, though not in the record on appeal, lends some support to his findings as to the character of the work done.

Oak Pass Road had been maintained as a dirt road sufficient for ingress and egress for the previous 15 years at a total cost of less than $3,000. The expenditure contracted by plaintiffs and certain defendants, for which contribution is now sought, was in excess of $15,000, and expert testimony introduced by plaintiffs was that the ''present'' road ''should have a life of five to fifteen years, depending upon a number of items which we can't foresee.''

No rights under the city ordinance are involved in this action. The city, as a prerequisite to its approval of "Private Street Map No. 91," recommended the oiling of the roadway 20 feet wide, and approved in lieu of the 20 feet of oil a pavement of rock and oil hot mix 16 feet wide proposed by plaintiff Holland.

The question for decision is whether some of the owners of a private easement over and along a dirt road have the right (without the consent of all of the owners of abutting property who are coowners of said easement) to cut trees, install culverts, regrade, widen and pave it, and enforce contribution from the dissenting owners.

Respondent urged and the court below held that the contributions sought by the instant action are not to the cost of "maintaining in repair," but to the cost of constructing a new and different road over the easement.

In the instant action, as in *Santa Cruz Rock Pavement Co.* v. *Broderick*, 113 Cal. 628 [45 P. 863], the written contract is not for "repairs" but "Re: Improvement of Oak Pass Road." Oak Pass Road was theretofore a "dirt road," which had been twice oiled and never paved. In the Santa Cruz case the street had been accepted by the city 15 years before, but it was not shown "that the street in question had ever been paved with bituminous rock," and the court said, at page 633: "It would be in violation of a proper construction of the term 'repair' to hold that it included an original improvement of the street, or work of a different character from that previously done thereon.' "

Mr. Justice Spence, speaking for the Supreme Court in *Whalen* v. *Ruiz*, 40 Cal.2d 294, 300 [253 P.2d 457], said:

", . . The word 'repair' in its ordinary sense relates to the preservation of property in its original condition, and does not carry the connotation that a new thing should be made or a distinct entity created. (76 C.J.S. p. 1169.) As was said in *Realty & Rebuilding Co.* v. *Rea*, 184 Cal. 565, at page 576 [194 P. 1024] : 'To repair means to mend an old thing, not to make a new thing; to restore to a sound state something which has become partially dilapidated, not to create something which has no existence.' (See also *Santa Cruz Rock Pavement Co.* v. *Broderick*, 113 Cal. 628, 633 [45 P. 863].) Appellant cites *Bosqui* v. *City of San Bernardino*, 2 Cal.2d 747 [43 P.2d 547], where the railroad's duty to 'keep in repair' was likened to the 'duty to maintain.' But under the facts there involved, no broader definition was thereby con-

templated. There the duty 'related to the structure itself,' a viaduct, including the 'duty to repair or replace weakened or worn portions' thereof, and the railroad was held liable when the viaduct was allowed to 'fail or decline' and injury was sustained as the result of certain splinters projecting from its worn and dilapidated wooden curbings. (P. 758.) There the failure to repair was a failure to keep the curbings in their original condition. Consistent with such definition of the word 'repair,' respondent had the duty to keep the overhead structure at the 'standard of efficiency' it had according to the design and plan under which it was originally constructed, but not to make structural changes to meet developing exigencies of traffic over the years. (See *In re Morris Ave. Bridge,* 105 Misc. 659 [174 N.Y.S. 682, 683].)''

Section 845 of the Civil Code applies only to "the cost of maintaining the road in repair." Paving the dirt road was not "maintaining it in repair."

The judgment is affirmed.

Doran, J., and Fourt, J., concurred.

A petition for a rehearing was denied March 28, 1956, and appellants' petition for a hearing by the Supreme Court was denied April 25, 1956.