Filed 1/2/25 (unmodified opn. attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Trinity)

----

| | |
|---|---|
| EBERHARD SCHNEIDER et al., | C097818 |
| Plaintiffs and Appellants, | (Super. Ct. No. 19CV0090) |
| v. | ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT] |
| KARLA S. LANE, | |
| Defendant and Appellant. | |

THE COURT:

It is ordered that the opinion filed in this matter on December 2, 2024, be modified as follows:

1.     On page 8 of the opinion, the paragraph beginning with the sentence "The trial court determined the easement's location" is modified to read as follows in its entirety:

The trial court determined the easement's location.  Lane had proposed three alternative routes, each of which were progressively further inland from the permissive route and progressively generated more severe impacts on the

---

[*]  Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of the entirety of Schneider's Cross-Appeal, and sections II, and III of Lane's Appeal.

Schneiders' interests. The Schneiders, through their expert witness, had proposed that the existing permissive route to a point in the meadow/pasture where it was safe to connect to the remaining undamaged portion of the 2011 easement route be designated as the easement route. The court selected the Schneiders' proposed route as the new easement route, finding that route best met the interests of all the parties and imposed "as slight of [a] burden as possible" on the servient tenement.

2.     On page 28 of the opinion, the paragraph beginning with the sentence "Here, the easement is no longer floating . . ." is modified to read as follows in its entirety:

Here, the easement is no longer floating because the trial court fixed its location as a matter of equity. But even if enforcing the 2011 judgment creates something akin to a permanent floating easement that clouds title, that result does not for the reasons already stated rise to the level of a material injustice under the circumstances of this case to justify not enforcing the 2011 judgment.

3.     On page 36 of the opinion, the paragraph beginning with the sentence "It appears that neither expert was asked . . ." the first sentence of the paragraph is deleted, and the paragraph is modified to read as follows in its entirety:

We believe the distinctions drawn by Fitzgerald better reflect the commonsense meaning of the phrase "maintain it in repair" as used in section 845. Maintenance may include making certain repairs to a road, but constructing a separate improvement away from the road to protect the road would be construction, not maintenance or repair for purposes of section 845.

2

4.      On page 44 of the opinion, the first sentence of the paragraph beginning with the sentence "Route 2 left the county road . . ." is modified to read as follows in its entirety:

> Route 2 ran along the east side of the Schneiders' property and turned west at a point south of the Schneiders' compound but just north of their veterinary office, and it ran west across the meadow until reaching Lane's property.

5.      On page 44 of the opinion, the paragraph beginning with the sentence "Route 3 left the county road . . ." is modified to read as follows in its entirety:

> Route 3 ran in a northwest direction from south of the veterinary office to the meadow and then west to Lane's property.  This route largely followed the permissive route through the Schneiders' pasture except it began further north.

These modifications do not change the judgment.  The petition for rehearing is denied.

BY THE COURT:

_____
HULL, Acting P. J.

_____
KRAUSE, J.

_____
MESIWALA, J.

3

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Trinity)

----

| | |
|---|---|
| EBERHARD SCHNEIDER et al., | C097818 |
| Plaintiffs and Appellants, | (Super. Ct. No. 19CV0090) |
| v. | |
| KARLA S. LANE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Alpine County, Eric L. Heryford, Judge. Affirmed in part and reversed in part.

Kassouni Law, Timothy Vartkes Kassouni for Defendant and Appellant.

Dickenson, Peatman & Fogarty, Paul G. Carey and Elena Mara Neigher for Plaintiffs and Appellants.

---

* Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of sections I, II, of Schneider's Cross-Appeal, and sections II, and III of Lane's Appeal.

1

On two separate occasions, riverbank erosion caused by flooding destroyed part of an appurtenant easement defendant Karla S. Lane used to access her property. A judgment in an action after the first incident established that the easement burdened the entirety of the servient tenement owned by plaintiffs Eberhard and Ursula Schneider. The trial court ruled that Lane was not required to reconstruct the damaged property for the easement, and it relocated the easement further inland on the Schneiders' land. The Schneiders did not appeal the judgment.

After the second flooding incident damaged the relocated easement, the Schneiders brought this action for quiet title and declaratory relief. Lane filed a cross-complaint for declaratory relief. The trial court granted Lane summary judgment against the Schneiders' complaint, ruling their complaint was barred by res judicata. At trial on Lane's cross-complaint, the court again relocated the easement further inland. But the court also ruled that Lane's responsibility for maintaining her easement under Civil Code section 845 obligated her to stabilize the riverbank from further erosion at her cost. (Undesignated statutory references are to the Civil Code.)

All parties appeal.

The Schneiders contend in their cross-appeal that res judicata does not bar their action. Alternatively, the Schneiders argue that we should not apply res judicata due to changed factual circumstances and because the first judgment's ruling that the easement burdened the entire servient tenement and could be relocated when it was destroyed was contrary to California law and would result in a manifest injustice.

We disagree with the Schneiders' contentions. The issues they seek to raise in this action are barred by collateral estoppel. Further, collateral estoppel applies because relevant factual circumstances have not changed, and because even though the prior decision may be legally incorrect, an incorrect decision without more does not establish a manifest injustice legally sufficient to justify not applying collateral estoppel.

2

Lane contends the trial court erred by obligating her to stabilize the riverbank, as such work is outside the scope of section 845's duty to maintain the easement. Lane also contends the court erred by not applying res judicata to the earlier judgment's holding that she could have the easement relocated on the Schneiders' property whenever it was damaged by flooding. Additionally, she asserts the court abused its discretion by not locating the easement further inland from the riverbank.

We agree with Lane in part. The trial court erred by interpreting section 845 as requiring her to stabilize the riverbank as part of maintaining the easement. The court, however, did not violate res judicata on the issue Lane raises, nor did the court abuse its discretion in locating the easement where it did.

We affirm in part and reverse in part.

FACTS AND HISTORY OF THE PROCEEDINGS

A.     The easement

The Schneiders and Lane own adjoining parcels of real property along the north bank of the South Fork of the Trinity River. Both parties trace their title back to a common grantor. Lane's property, which lies to the west of the Schneiders' property, benefits from an express appurtenant access easement conveyed by the common grantor that burdens the Schneiders' property. The easement provides ingress and egress between Lane's property and a county road on the east side of the Schneiders' property. Without the easement, Lane's property would be landlocked, and an easement would have been implied by necessity.

The easement was not described in metes and bounds. The deed conveying the easement described the easement as "a non-exclusive easement for ingress and egress along the existing road and driveway . . . ." The existing road was known as Old River Road (or River Road), which ran east and west across the south end of the Schneiders' property along the riverbank.

3

B.    The 2011 judgment

In 2002, flooding on the South Fork of the Trinity River washed away part of River Road that Lane used to access her property, destroying the easement route, and leaving it unusable. Lane filed an action in 2003 to quiet title to her easement and for declaratory relief. While the action was pending, the Schneiders granted Lane a license to traverse their land along the southern perimeter of their property paralleling the escarpment where the flood had washed away the land supporting River Road.

The trial court rendered its judgment in 2011. The court found that the easement was a general easement which ran with the land and burdened the entire servient tenement. In order to establish and "give meaning to the easement on the ground," the court was required to designate a new access route across the Schneiders' property.

The Schneiders had argued it was Lane's sole obligation to repair and rebuild the old road on the land where it once was, which was now a floodplain below the parties' lands separated by an escarpment. Evidence showed that rebuilding the road on that land would involve an expensive permitting process and expensive construction of a raised roadbed and ramps. Neither side wanted to incur the expense, and neither would share the expense with the other. The Schneiders contended that if Lane did not rebuild the road at her cost, the easement was lost and forfeited.

The trial court believed that the Schneiders' argument was based on a faulty premise, that the easement inhered only in River Road and could only be recreated on a rebuilt road in the vicinity of the location of River Road now down in the floodplain. The court found that the easement instead was "an interest in land, not just an interest in the strip of land used at any one time for ingress and egress."

The court relied on dicta in *Muzio v. Erickson* (1919) 41 Cal.App. 413 (*Muzio*) it claimed exposed the fallacy in the Schneiders' approach. In that matter, the Court of Appeal held that a grant of a right of way to use a building's exterior stairway was not an

4

interest in land and did not survive the building's destruction by fire. (*Id*. at p. 416.) Contrasting such a right of way with an easement, the *Muzio* court stated, "An easement, in the true sense of the word, is an interest in real estate, and survives the destruction of a part of the servient tenement when there is anything remaining upon which the easement may operate." (*Id*. at pp. 416-417.)

The trial court found the *Muzio* dicta persuasive and followed it. The court ruled as a matter of law that because there were "alternative routes remaining on the servient tenement," one being the route granted in the license, Lane's easement survived the destruction of the River Road, and the Schneiders had to provide a replacement route. The court granted declaratory relief in Lane's favor and designated the route the Schneiders had provided in the license "as the operative easement with all the rights and obligations that entails under the law." We refer to this easement route as the 2011 route. The Schneiders did not appeal this judgment.

At the 2011 hearing, the trial court commented on what it believed would happen if the 2011 route was ever destroyed. The court stated, "If this licensed path is destroyed, then we're back to square one, and we have a whole new ball game there. We have this question of whether there is any more land on the servient tenement that would suffice, and maybe if that license route that is now being used was destroyed, maybe it would be back to square one and thinking about relocating an access down in the wetlands, as both parties have stressed during their presentation of testimony in this case. I don't think we're there yet." The court, however, did not address this issue in its judgment or statement of decision.

"Since entry of the 2011 judgment, neither Lane nor anyone acting on her behalf has performed any work on the riverbank adjacent to the [2011 route] in order to protect the riverbank and [the] route from damage by erosion or movement of the river."

5

## C.      This action

Flooding in 2018 caused significant damage and erosion to the 2011 route.  The Schneiders gave Lane permission to use a temporary access route across their property again parallel to the escarpment pending resolution of this, the resulting action.  We refer to this route as the permissive route.

The Schneiders initiated this action in 2019 for quiet title and declaratory relief. They alleged that Lane, in violation of section 845, had not maintained the 2011 route to protect it from the known risk of further erosion.  Lane had also allowed multiple large trucks carrying heavy equipment to drive back and forth along the 2011 route without taking any steps to protect the easement or the adjacent riverbank from damage.  The Schneiders alleged that the damage to the 2011 route from the 2018 flooding was a result of Lane's not maintaining the easement and protecting it from the known risk of riverbank erosion.  And, since the grant of permission to use the permissive route, Lane had not repaired, and refused to repair, the 2011 route.  She instead claimed the right to relocate the road and easement to another location on Schneiders' property.

The Schneiders sought to quiet title against Lane's claims of an easement over all of their property that can be moved whenever it was damaged or destroyed, and to limit her easement to the 2011 route established by the 2011 judgment.  They also sought a declaration that the easement was limited to the 2011 route, that Lane had a duty to maintain and protect the easement and its road from the known risk of future erosion of the adjacent riverbank, and that the easement route could not be relocated even if the 2011 route was damaged or partially destroyed.

Lane filed a cross-complaint for declaratory relief.  She asked the trial court to order the Schneiders to cooperate with her on locating an alternate route for the easement that was safe for her and least restrictive to the Schneiders.

6

D.   Motions for summary judgment

Both sides filed motions for summary judgment.  Lane contended the Schneiders' action was barred by res judicata and collateral estoppel under the 2011 judgment.  She argued the 2011 judgment resolved the issues the Schneiders raise in this action:  whether Lane's easement rights were lost with the destruction of the easement route and whether she had a duty to rebuild the destroyed route if she wanted to keep her right to cross the Schneiders' property.  She also argued that any duty she had under section 845 to maintain or repair the easement did not as a matter of law also require her to preserve the servient tenement's property by repairing and stabilizing the riverbank.

In their motion for summary judgment against Lane's cross-complaint, the Schneiders contended that under California law, if an easement route is destroyed, the dominant tenement has no right to select a new route, and Lane has no right to move her easement without the Schneiders' consent.  The Schneiders also argued that Lane's duty to maintain her easement under section 845 required her to protect the route from damage or failure from erosion of the riverbank.  Because Lane did not do any work to protect the riverbank from further eroding and damaging the easement, she lost her easement when it was destroyed.  The Schneiders argued that the 2011 judgment did not bar their action under res judicata.

The trial court granted Lane's motion and denied the Schneiders' motion.  It ruled that the Schneiders' causes of action for quiet title and declaratory relief were barred by res judicata, as they raised the same facts and issues involving the same parties as the 2011 judgment, and the Schneiders had not appealed that judgment.  The court also found there were material facts in controversy in Lane's action for declaratory relief, including the location of an easement for access to her property and what maintenance may be required for that easement.

The Schneiders petitioned this court for a writ of mandamus. We denied the petition.

### E.    Trial

The matter went to a court trial on the issues of where the easement should be located and which of the parties were responsible for its maintenance and repair. Prior to trial, the court inspected the site with the parties, their counsel, and their respective potential expert witnesses.

In its statement of decision, the trial court stated the 2011 judgment had relied on dicta in *Muzio* that an easement survived its destruction if any land for it remained on the servient tenement. The 2011 trial court had also commented that any future damage to the new easement would bring the parties "back to 'square one' and that the law of equity would apply." The trial court stated it had previously ruled that the 2011 judgment's ruling as to an easement under the dicta in *Muzio* was res judicata for purposes of a quiet title action.

The trial court determined the easement's location. Lane had proposed three alternative routes, each of which were progressively further inland from the permissive route and progressively generated more severe impacts on the Schneiders' interests. The Schneiders had proposed that the existing permissive route be designated as the easement route. The court selected the Schneiders' proposal that the permissive route be the new easement route, finding that route best met the interests of all the parties and imposed "as slight of [a] burden as possible" on the servient tenement.

Lane had requested a location route that was "safe and least restrictive for her," favoring her two most inland alternatives. The trial court found no legal authority for either of those propositions. It acknowledged the evidence had indicated it was not unlikely that without maintenance and repair along the riverbank, that portion of the Schneiders' property could erode further in the future, again impacting Lane's easement.

8

Lane had argued, based on the *Muzio* dicta, that as long as land was available on the servient tenement, her easement as the dominant tenement could be moved "ad infinitum." The trial court rejected this argument, concluding there was no authority that an easement for ingress and egress could keep being moved with no consideration to the owners of the servient tenement.

We note the language of the statement of decision states "no consideration to the owners of the dominant tenement," but because the court was rejecting the dominant tenement's argument, we presume the statement is in error and that the court meant to refer to the owners of the servient tenement.

Determining responsibility for maintenance, the trial court interpreted section 845 to impose on Lane the obligation to repair and maintain the easement. That statute states, "The owner of any easement in the nature of a private right-of-way, or of any land to which any such easement is attached, shall maintain it in repair." (§ 845, subd. (a).) The court ruled that section 845 imposed the obligation to maintain the easement on Lane, and that the obligation included repairing and protecting the riverbank. The court stated the easement in its new location was "attached to the riverbank." Thus, "the obligation to maintain the easement in repair includes the riverbank to the extent and to those portions it is attached to."

There was evidence at trial regarding what work could be done to stabilize the approximately 25 feet of riverbank, which was 30 to 50 feet away from the permissive route. There was also evidence the costs for that work could be significant, and that some public resources could be available to help fund it. One expert witness testified the project could cost up to $250,000 for its design and up to $1,000,000 for its implementation. The court stated that regardless of the costs of required maintenance and repair, "that obligation falls on the owner of the easement."

9

I

*Preclusive Effect of the 2011 Judgment*

The Schneiders contend the trial court erred by denying their motion for summary judgment and granting Lane's motion by giving res judicata effect to the 2011 judgment's determinations that Lane's easement attached to the Schneiders' entire parcel and that the easement survived the destruction of the River Road.

A.    Legal background

"Res judicata" is an umbrella term that encompasses both the doctrines of res judicata and collateral estoppel. (*Guerrero v. Department of Corrections & Rehabilitation* (2018) 28 Cal.App.5th 1091, 1098.) For the sake of clarity, we will use the modern terms applied to those doctrines, claim preclusion and issue preclusion, respectively, except where it is unclear which doctrine is being discussed by the parties or in the reported opinions. (*Samara v. Matar* (2018) 5 Cal.5th 322, 326.)

In general, under claim preclusion, a prior judgment bars a new legal action between the same parties on the same cause of action. Under issue preclusion, a prior judgment bars relitigating issues in a new legal action that were fully litigated and decided against one of the new action's parties. (*DKN Holdings LLC v. Faerber* (2015) 61 Cal.4th 813, 824-825 (*DKN Holdings*).)

With very few exceptions, these doctrines bar further litigation regardless of whether the prior decision was properly decided. (*Castro v. Higaki* (1994) 31 Cal.App.4th 350, 359.) "[F]or the purposes of res judicata, an erroneous judgment is as conclusive as a correct one under both federal and California law." (*Valerio v. Boise Cascade Corp.* (1986) 177 Cal.App.3d 1212, 1223.) Whether claim preclusion and issue preclusion apply are questions of law we review de novo. (*Johnson v. GlaxoSmithKline, Inc.* (2008) 166 Cal.App.4th 1497, 1507.)

## 1. Claim preclusion

The doctrine of claim preclusion "acts to bar claims that were, or should have been, advanced in a previous [lawsuit] involving the same parties." (*DKN Holdings, supra*, 61 Cal.4th at p. 824.) Claim preclusion arises "if a second suit involves (1) the same cause of action (2) between the same parties (3) after a final judgment on the merits in the first suit. [Citations.] If claim preclusion is established, it operates to bar relitigation of the claim altogether." (*Ibid*.) "[I]f a plaintiff prevails in an action, the cause is merged into the judgment and may not be asserted in a subsequent lawsuit; a judgment for the defendant serves as a bar to further litigation of the same cause of action." (*Mycogen Corp. v. Monsanto Co.* (2002) 28 Cal.4th 888, 896-897.)

The operation of claim preclusion rests on the "primary rights" theory. (*Boeken v. Philip Morris USA, Inc.* (2010) 48 Cal.4th 788, 797.) Under that theory, a remedial right known as a "cause of action" "arises from the invasion of a primary right. Although different grounds for legal relief may be asserted under different theories, conduct that violates a single primary right gives rise to only one cause of action." (*DKN Holdings, supra*, 61 Cal.4th at p. 818, fn. 1.) A primary right " 'is simply the plaintiff's right to be free from the particular injury suffered.' " (*Mycogen Corp. v. Monsanto Co., supra*, 28 Cal.4th at p. 904.) The determinative factor is the harm suffered. (*Boeken*, at p. 798.)

The parties dispute the extent to which claim preclusion applies in this action. Claim preclusion, however, does not apply here. Similar harms that occur to the same primary right at different times raise separate causes of action. (See *Louis Stores, Inc. v. Department of Alcoholic Beverage Control* (1962) 57 Cal.2d 749, 757 [prior administrative proceeding that determined licensee violated terms of license did not preclude second action alleging licensee violated license in the same manner but at a different time; the second proceeding "presents a cause of action different from" the prior administrative proceeding].) "Res judicata is binding solely as to acts and omissions

11

which occurred prior to the former adjudication." (*Lake Merced Golf and Country Club v. Ocean Shore Railroad Co.* (1962) 206 Cal.App.2d 421, 435.)

Claim preclusion does not apply here because although the primary right addressed in both the 2011 judgment and this action is the loss of Lane's easement route, separate harms to that same primary right raise separate claims or causes of action. We thus will not address the parties' arguments concerning claim preclusion.

### 2. Issue preclusion

In contrast to claim preclusion, the doctrine of issue preclusion does not bar causes of action. It prevents relitigating previously decided issues. (*DKN Holdings, supra*, 61 Cal.4th at p. 824.) Under issue preclusion, "a prior judgment between the same parties operates as an estoppel or conclusive adjudication as to those issues that were actually litigated and necessarily determined in the prior action." (*Groves v. Peterson* (2002) 100 Cal.App.4th 659, 667, italics omitted.)

Issue preclusion applies "(1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party." (*DKN Holdings, supra*, 61 Cal.4th at p. 825.) However, even when these requirements are satisfied, "our analysis is not at an end. We have repeatedly looked to the public policies underlying the doctrine before concluding that collateral estoppel should be applied in a particular setting." (*Lucido v. Superior Court* (1990) 51 Cal.3d 335, 342-343.) The doctrine of issue preclusion seeks to prevent inconsistent judgments which undermine the integrity of the judicial system, promotes judicial economy, and prevents a person from being harassed by vexatious litigation. (*Id.* at p. 343.)

### B. The Schneiders' contentions

In granting summary judgment to Lane and again at trial, the trial court gave preclusive effect to the 2011 judgment's determinations that Lane's easement attached to

12

the Schneiders' entire parcel and that it survived the destruction of the River Road because, applying *Muzio*, other land on the servient tenement was available for the easement route.

The Schneiders contend the trial court erred in giving these 2011 rulings preclusive effect. All the elements of issue preclusion, however, are satisfied. Whether Lane's easement attached to the entirety of the Schneiders' property and survived its partial destruction were issues actually decided in the 2011 judgment and were presented again in this action. The trial court in the 2011 judgment expressly ruled that the easement attached to the entire servient tenement and that, under the rule of *Muzio*, it was not destroyed by the erosion and Lane's not rebuilding it as long as other land remained on the servient tenement where the easement could operate.

The issue was also necessarily decided in the 2011 judgment because the trial court's determination of whether the easement survived and where the easement could be located was based on whether the easement burdened the entire servient tenement. By finding the easement was an interest in the entire servient tenement, the court under its reading of *Muzio* could determine the easement survived the destruction of River Road and could be relocated by the court. There is no dispute the 2011 judgment is final, as the Schneiders did not appeal the judgment. And, of course, the parties in both actions are identical.

The Schneiders, however, contend that even if the 2011 judgment meets the requirements of issue preclusion, the doctrine should not apply. They assert the doctrine does not apply due to changed factual circumstances since the 2011 judgment was issued, and because a manifest injustice would result from applying it. We address both arguments. (We do not address the Schneiders' arguments that this action is based on a different primary right, the 2011 judgment for declaratory relief has limited res judicata effect, and that the 2011 judgment permitted this action, as those arguments concern claim preclusion.)

13

### 1.    Changed circumstances

Issue preclusion does not apply "where there are changed conditions or new facts which did not exist at the time of the prior judgment, or where the previous decision was based on different substantive law." (*United States Golf Assn. v. Arroyo Software Corp.* (1999) 69 Cal.App.4th 607, 616; see *People v. Ocean Shore Railroad* (1948) 32 Cal.2d 406, 418-419.)  Issue preclusion " 'was never intended to operate so as to prevent a re-examination of the same question between the same parties where, in the interval between the first and second actions, the facts have materially changed or new facts have occurred which may have altered the legal rights or relations of the litigants.' " (*Evans v. Celotex Corp.* (1987) 194 Cal.App.3d 741, 748, quoting *Hurd v. Albert* (1931) 214 Cal. 15, 26.)

The Schneiders assert that circumstances have changed since the 2011 judgment in a number of respects.  The circumstances arise from Lane's purported failure to maintain and repair the 2011 easement and the remedies for that asserted breach of duty, an issue that was not raised in the 2011 judgment.  The Schneiders also contend the 2011 judgment only considered whether Lane should rebuild the road in the riverbed where it had been before, whereas this action concerns whether she breached a duty to maintain her easement by protecting it from potential erosion and whether she has a similar duty with any new easement.

Additionally, the Schneiders allege that heavy equipment traveled on the unprotected easement.  There was also evidence that the easement could be maintained by stabilizing the riverbank.  The Schneiders were willing to cooperate with Lane if she performed the stabilization project.  The Schneiders also rely on the trial court's statement at oral argument that if the 2011 easement route was damaged, a new case would be necessary.

14

These purported new circumstances do not alter the parties' legal rights or relations as to the issues litigated in the 2011 action and which are at issue in this action, nor do they affect the 2011 judgment's resolution of those issues: whether Lane's easement burdened the entire servient tenement and survived the access route's partial destruction and thus could be relocated. Other than this action being a separate cause of action for purposes of claim preclusion, the facts and issues given preclusive effect have not materially changed since the 2011 judgment. In both actions, Lane's easement access was destroyed by riverbank erosion due to flooding, and the issue was whether the easement survived its partial destruction.

The Schneiders' purported changed circumstances do not alter the existence or resolution of these identical and material issues. The Schneiders assume that Lane had a duty to stabilize the riverbank under section 845, but we reject that argument below. And whether there was evidence the riverbank could be stabilized does not affect the 2011 judgment's ruling that the easement burdened the entire servient tenement.

As to the court's statement at oral argument, assuming for purposes of argument that it was relevant, nothing in the statement forecloses the operation of issue preclusion in a subsequent case brought to address new damage to the 2011 easement. The 2011 court stated, "If this licensed path is destroyed, then we're back to square one, and we have a whole new ball game there. We have this question of whether there is any more land on the servient tenement that would suffice, and maybe if that license route that is now being used was destroyed, maybe it would be back to square one and thinking about relocating an access down in the wetlands, as both parties have stressed during their presentation of testimony in this case. I don't think we're there yet."

In this statement, the trial court implicitly recognized that claim preclusion would not bar a second action such as this one if the easement route was destroyed a second time. But nothing in its statement prevents issue preclusion from barring relitigation of whether the easement burdens the entire servient tenement and survives if it is partially

15

destroyed and there is available land on the servient tenement. Indeed, the trial court assumed issue preclusion would apply because it stated the issue to be resolved in a subsequent action would be whether there was any more land on the servient tenement that could accommodate the easement. Nowhere in its statement did the court say subsequent destruction of the easement would again raise the issue of whether the easement survived or was forfeited. Because the existence of the easement was at issue in this matter, and the identical issue was fully and finally litigated in the 2011 judgment under identical circumstances, the exception to the issue preclusion doctrine for changed circumstances does not apply.

### 2. Manifest injustice exception

The Schneiders contend we should not apply issue preclusion because the trial court's application of applying *Muzio's* allegedly flawed legal reasoning contravenes established California law of easements and results in an injustice.

Under rare exceptions to the doctrine of issue preclusion, a prior judgment may not result in issue preclusion where the issue is one of law if a manifest injustice would result or if the public interest requires that relitigation not be foreclosed. (*City of Sacramento v. State of California* (1990) 50 Cal.3d 51, 64.) The two exceptions are distinct from one another. (*Arcadia Unified School Dist. v. State Dept. of Education* (1992) 2 Cal.4th 251, 258.)

The Schneiders contend the exception for a manifest injustice applies here. They argue that applying the *Muzio* dicta results in an injustice because the decision is incorrect on the law. They assert that under California law, easements over land cannot burden the entirety of the servient tenement and are extinguished by their physical destruction. Applying *Muzio* clouds title to all their property in perpetuity, and it is contrary to the express terms of the 2011 judgment that the easement is subject to all rights and obligations that the declaration of the easement entails under law. The

16

Schneiders also argue that applying *Muzio* is contrary to the 2011 court's statement at trial that further damage to the 2011 easement would put the parties "back to square one."

### a. Exception's legal background

Due to the manifest injustice exception's rarity, we review in detail a number of reported opinions that applied the exception to understand its scope and determine whether it may apply here.

The California Supreme Court's decision in *Greenfield v. Mather* (1948) 32 Cal.2d 23 (*Greenfield*) is a leading opinion on the exception. In that matter, husband assigned to his wife one-half of his interest in a claim against an estate. (*Id*. at p. 24.) Husband subsequently brought an action in Los Angeles County Superior Court claiming the assignment was void. (*Id*. at p. 25.) The trial court found for wife, and husband appealed. (*Id.* at p. 26.)

Meanwhile, the estate filed an interpleader action against husband and wife in San Francisco County Superior Court. (*Greenfield, supra*, 32 Cal.2d at p. 24.) The estate had already distributed much of the money due on the claim, and it deposited the funds remaining to be distributed with the trial court. (*Id*. at pp. 24-25.) Husband had received more than he was owed under the terms of the assignment. (*Id*. at p. 25.)

Husband's appeal from the Los Angeles judgment resulted in reversals, new judgments by that court, and new reversals by the California Supreme Court, all of which conflicted with one another, improperly introduced the issue of the parties' interests in the San Francisco fund and confused the concepts of one-half interest in the claim with half of the unpaid balance of the claim held by the San Francisco court. (*Greenfield, supra*, 32 Cal.2d at pp. 25-33.) Nonetheless, at the direction of the Supreme Court, the Los Angeles court entered a judgment declaring that husband and wife were each entitled to one-half of the fund held by the San Francisco court. (*Id*. at p. 33.) The Supreme Court ordered this judgment without also ordering amendment to the pleadings or introduction

17

of evidence regarding the amount of payments already received by the parties from the estate.  (*Ibid*.)  Neither party appealed.  (*Ibid*.)

In the San Francisco interpleader action, husband had contended he was entitled to the entire amount held by the court because the assignment to his wife was invalid.  (*Greenfield, supra*, 32 Cal.2d at pp. 33-34.)  Wife had contended she was entitled to the full amount because she had been underpaid according to the terms of the assignment.  (*Id*. at p. 34.)  At trial, husband asserted the Los Angeles judgment was res judicata.  (*Id*. at p. 25.)  The trial court agreed the judgment was res judicata, refused to hear any of wife's evidence concerning the overpayment of husband's claim, and awarded one-half of the monies it held to husband and one-half to wife.  (*Ibid*.)

Reviewing the interpleader judgment, the California Supreme Court refused to apply res judicata and reversed.  (*Greenfield, supra*, 32 Cal.2d at p. 35.)  There had been no pleadings or evidence in the Los Angeles action regarding the parties' interests in the San Francisco fund or the payments the parties had already received on the claim.  (*Id*. at p. 34.)  And the Los Angeles decision had resulted from conflicting decisions of the Supreme Court and its mistreatment of the issues.  (*Ibid*.)  Rejecting res judicata, the Supreme Court stated, "We are mindful of the rule that a judgment rendered in an action in personam by a court having jurisdiction over the subject matter and the parties is not void and subject to collateral attack merely because it may erroneously determine some matter not specifically raised in the pleadings, and not covered by the evidence before the trial court, and that such a judgment is res judicata.  We adhere to this rule.  [Citations.] But in rare cases a judgment may not be res judicata, when proper consideration is given to the policy underlying the doctrine, and there are rare instances in which it is not applied.  In such cases it will not be applied so rigidly as to defeat the ends of justice or important considerations of policy.  [Citations.]  [¶]  By reason of the special circumstances appearing in this case, as above narrated, we are constrained to hold that the doctrine of res judicata should not be applied here[.]"  (*Id*. at p. 35.)  The high court

remanded for a trial addressing the parties' claims to the money held by the San Francisco court. (*Ibid*.)

Justice Traynor dissented. (*Greenfield, supra*, 32 Cal.2d at p. 35.) He stated that despite the majority's claim to adhere to the rule of res judicata, the majority "departs from the rule by holding that the application of the doctrine of res judicata in the present case would 'defeat the ends of justice or important considerations of policy'; how, any more than in hundreds of other cases where the courts have refused to reexamine final judgments to determine whether or not they were erroneous, is never specified. So cavalier a departure from res judicata throws into question the finality of any judgment and thus is bound to cause infinitely more injustice in the long run than it can conceivably avert in this case. It is an invitation to all unsuccessful litigants to relitigate their cases, for they commonly view judgments against them as erroneous and hereafter can contend with justifiable cause that their cases also present an exceptional combination of circumstances requiring a departure from the doctrine of res judicata." (*Id.* at pp. 35-36.)

Twenty-seven years later, the California Supreme Court questioned the *Greenfield* court's holding. In *Slater v. Blackwood* (1975) 15 Cal.3d 791 (*Slater*), the court stated, "There is some authority for the proposition that, in particular circumstances, courts may refuse to apply res judicata when to do so would constitute a manifest injustice. (See *Greenfield* [. . . .].) We consider the *Greenfield* doctrine of doubtful validity and it has been severely criticized." (*Slater,* at p. 796.)

The *Slater* court, however, did not overrule *Greenfield*. Instead, it held that the manifest injustice exception did not apply where the only basis for applying it was a change in law following the original judgment. (*Slater, supra*, 15 Cal.3d at p. 796; *City of Sacramento v. State of California, supra*, 50 Cal.3d at p. 65, fn. 8.) To apply the exception in a second action based on the same cause of action adjudicated in the first action where the law had subsequently changed raised the concerns Justice Traynor had

expressed in his *Greenfield* dissent. (*Slater*, at p. 797.) "The consistent application of the traditional principle that final judgments, even erroneous ones [citations], are a bar to further proceedings based on the same cause of action is necessary to the well-ordered functioning of the judicial process. It should not be impaired for the benefit of particular plaintiffs, regardless of the sympathy their plight might arouse in an individual case." (*Ibid*.)

The manifest injustice exception to issue preclusion appears to be viable, but only in "rare circumstances." (*F.E.V. v. City of Anaheim* (2017) 15 Cal.App.5th 462, 465 (*F.E.V.*).) In some instances, courts have relied on the exception where applying claim or issue preclusion would result in the inequitable administration of justice beyond simply correcting an erroneous judgment. For example, approximately seven months before deciding *Slater,* the California Supreme Court applied the exception in *City of Los Angeles v. City of San Fernando* (1975) 14 Cal 3d 199 (*City of San Fernando*), disapproved on another ground in *City of Barstow v. Mojave Water Agency* (2000) 23 Cal.4th 1224, 1248. In that action, the City of Los Angeles sought to quiet title against numerous defendants, including the Cities of Glendale, Burbank, and San Fernando, and obtain a declaration of its prior rights to water from the Los Angeles River. (*City of San Fernando,* at p. 207.) In a prior action against Glendale and Burbank some 30 years earlier, the Supreme Court had affirmed that Los Angeles had a pueblo right to the water as against those two cities. (*Id*. at pp. 211-212.) Los Angeles claimed that the prior judgment was res judicata against Glendale and Burbank in the second action. (*Id*. at pp. 226-227.)

The California Supreme Court determined it would be unjust and against the public interest to apply issue preclusion against the two cities. (*City of San Fernando, supra*, 14 Cal.3d at p. 230.) The court did not cite *Greenfield* as a source for the exception. Rather, it referred to section 70 of the Restatement of Judgments which at that time read, " 'Where a Question of law essential to the judgment is actually litigated and

20

determined by a valid and final personal judgment, the determination is not conclusive between the parties in a subsequent action on a different cause of action, except where both causes of action arose out of the same subject matter or transaction; and in any event it is not conclusive if injustice would result.' "[1] (*Ibid*.)

The *City of San Fernando* court reasoned it would be unjust to bind Glendale and Burbank to the prior decision if in the new action the court decided not to follow the prior judgment when declaring the rights of the other defendants who were not parties to the prior action. (*City of San Fernando, supra*, 14 Cal.3d at p. 230.) There also was a strong public interest to determine conflicting claims of public entities to water resources which were capable of furnishing substantial portions of the entities' respective water needs. (*Ibid*.)

The Court of Appeal in *City of Watsonville v. Merrill* (1982) 137 Cal.App.3d 185, applied the manifest injustice exception to prevent the inequitable administration of justice following changed circumstances. In that action, the county auditor refused to release tax revenues for the city to pay its annual payment to the Public Employees Retirement System, believing the release would violate the state constitution. (*Id*. at p. 190.) The city sued, and the parties entered into a stipulated settlement where the auditor agreed to release the monies for a particular fiscal year and the city agreed to dismiss its complaint as moot. (*Id*. at pp. 190-191.) The city sued the auditor again when he refused to release the monies in a subsequent fiscal year, but the trial court determined

---

[1]    See now Restatement Second of Judgments, section 28: "Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitigation of the issue in a subsequent action between the parties is not precluded in the following circumstances:  [¶] . . . [¶]  (2)  The issue is one of law and (a) the two actions involve claims that are substantially unrelated, or (b) a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws[.]" (Rest.2d Judgments, § 28, subd (2).)

the action was precluded by the stipulated settlement.  (*Id*. at p. 191.)  While the city's appeal from that judgment was pending, the California Supreme Court issued an opinion in a different matter holding that release of tax revenues for a city to pay its PERS obligations was lawful.  (*Id*. at pp. 191-192.)  Citing *City of Fernando*, the Court of Appeal then ruled that under these circumstances, giving the stipulated settlement preclusive effect would result in injustice.  (*Id*. at pp. 194-195.)  It would be unjust and unreasonable to allow the auditor to invoke claim and issue preclusion to deprive the city of its right to collect and receive the additional tax revenues "based upon ill-applied, rigid legal technicalities."  (*Id*. at p. 195.)

A panel of this court addressed the manifest injustice exception to protect against the inequitable administration of justice in *Louie v. BFS Retail & Commercial Operations, LLC* (2009) 178 Cal.App.4th 1544.  In that matter, we held that the plaintiff's state action for damages under the California Disabled Person's Act was not precluded by an earlier federal class action against the defendant under the federal Americans with Disabilities Act that was resolved by consent decree.  This was because the decree had excluded any claims for damages, and thus that issue was not resolved in the prior action.  (*Id*. at pp. 1547-1548, 1559.)  Assuming the manifest injustice exception exercised in *Greenfield* continued to exist, the court stated that even if a basis for claim preclusion existed, applying the doctrine would be manifestly unjust due to the defendant's agreement in the federal action to reserve damage claims and the fact that the federal court had approved a relaxed fashion of notice to absent class members due to the consent decree.  (*Id*. at p. 1562.)

In addition to preventing an inequitable administration of justice, courts have refused to apply claim or issue preclusion when doing so would defeat those doctrines' purposes.  The California Supreme Court conducted that analysis in *People v. Barragan* (2004) 32 Cal.4th 236.  In that criminal action, the high court held that issue preclusion did not bar a sentencing retrial where the Court of Appeal had reversed a Three Strikes

22

prior conviction enhancement for insufficient evidence.  A reversal for insufficient evidence of a prior conviction finding is generally not a final decision on the merits regarding the truth of the alleged prior conviction.  (*Id*. at pp. 253-254.)

The high court stated that even if the defendant could satisfy all of the requirements for issue preclusion, applying the doctrine would be inappropriate.  (*People v. Barragan, supra*, 32 Cal.4th at p. 256.)  In criminal cases, issue preclusion " ' "is not to be applied with the hypertechnical and archaic approach of a nineteenth century pleading book, but with realism and rationality." ' "  (*Ibid*.)  Courts repeatedly have looked to the public policies underlying issue preclusion before applying it in a particular setting.  (*Ibid*.)  Under *Greenfield*, public policy considerations may also warrant an exception to issue preclusion at least where the issue is a question of law, which an appellate determination of the sufficiency of the evidence is.  (*Ibid*.)  The court concluded that applying issue preclusion in this instance would not advance the policies supporting the doctrine.  There was no risk to the criminal justice system's integrity that could arise from inconsistent verdicts, there was no threat of baseless or unjustified further litigation, and a retrial of a prior conviction allegation is simple and would not affect judicial economy.  (*Id*. at pp. 256-258.)

The Court of Appeal in *F.E.V., supra*, 15 Cal.App.5th 462, relied on the polices underlying claim preclusion to decide that applying the doctrine would be manifestly unjust.  In that matter, the Court of Appeal had originally affirmed a demurrer against the plaintiffs' wrongful death complaint on the ground of claim preclusion based on a federal district court judgment against plaintiffs which a panel of the Ninth Circuit had affirmed.  (*Id*. at pp. 466-468.)  After the Ninth Circuit reheard the matter en banc and reversed the district court's judgment, plaintiffs filed a new state complaint alleging the same causes of action.  (*Id*. at p. 468.)  The trial court sustained a demurrer on the basis of claim preclusion.  (*Id*. at pp. 468-469.)

The Court of Appeal reversed. *(F.E.V., supra*, 15 Cal.App.5th at p. 466.) Its prior opinion was based entirely on the preclusive effect of the federal court judgment. By reversing that judgment en banc, the Ninth Circuit eliminated the basis for the Court of Appeal's opinion. But the original state judgment remained immune from attack or review. (*Id*. at pp. 471, 473-474.) The "rare circumstances" of the case justified not applying claim preclusion. (*Id*. at p. 475.) The court stated it would be "manifestly unjust" to give preclusive effect to the judgment it had affirmed earlier, and it relied on the public policies behind claim preclusion to support not barring the action. (*Id*. at pp. 472, 474.) The plaintiffs had not had an opportunity to litigate the merits of their state claims, so they could not be labeled vexatious litigants. (*Id*. at p. 476.) The Ninth Circuit's en banc opinion was not a change in the law, and giving preclusive effect to a judgment the validity of which was based entirely on a judgment that had been reversed would not have preserved the judicial system's integrity. (*Ibid*.)

Other Court of Appeal decisions, however, found no manifest injustice to excuse applying claim or issue preclusion where the party did not appeal the prior decision or had consented to it.

In *Carroll v. Puritan Leasing Co.* (1978) 77 Cal.App.3d 481 (*Carroll*), the plaintiff had guaranteed equipment lease agreements between a leasing company and her then-husband. The leasing company sued the couple after they breached the agreements, and the court ruled that husband and plaintiff were jointly and severally liable. The couple initiated an appeal but later dismissed it. (*Id*. at p. 484.) After the leasing company began judgment execution proceedings on real property owned by the plaintiff, plaintiff sued to quiet title, arguing her separate property by statute was not liable for the community property's judgment debt. (*Id*. at pp. 484-485.) The trial court sustained a demurrer on the ground of res judicata, and the Court of Appeal affirmed. Both actions concerned whether the plaintiff was liable under the guarantee, and the plaintiff had not appealed the first judgment. (*Id*. at pp. 485-491.)

24

The Court of Appeal ruled that the plaintiff had not shown that an injustice would result from barring the second action: "True appellant will be adversely affected if her property is subjected to execution; but, of course, respondent [leasing company] would be adversely affected if it cannot recover upon the deficiency judgment. Adverse consequences alone obviously cannot outweigh the interest in having an end to litigation. The matter which appellant seeks to assert was clearly within the scope of the prior action; appellant had the opportunity to litigate the very limitation on her liability that she now seeks to assert, and apparently did so . . . . Appellant . . . had ample notice that the trial court had ruled against her on that matter and could have appealed the decision." (*Carroll, supra*, 77 Cal.App.3d at p. 489.)

The *Carroll* court considered and rejected some of the reasons that could lead to a manifest injustice: "This is not a case where the application of collateral estoppel would result in injustice; in the prior case appellant had and utilized her opportunity to litigate the very matter she now seeks to raise. Nor is this a case in which the application of collateral estoppel would allow a party who has previously won on an issue to obtain an unfair advantage as against third persons in the administration of the law. [Citations.] Nor is this a case where the issue sought to be relitigated arises out of a different subject matter or transaction. [Citations.] On the contrary, appellant seeks to relitigate her liability for the same default of the same lease and guarantee as against the same party." (*Carroll, supra*, 77 Cal.App.3d at p. 493.)

In *Johnson v. American Airlines, Inc.* (1984) 157 Cal.App.3d 427, the plaintiff employee objected to a settlement in a federal sex discrimination class action challenging the airline's mandatory maternity leave program. The trial court approved the settlement, and the plaintiff chose not to participate in the fund set up under the settlement for back pay and did not appeal. She instead filed a separate state action. (*Id*. at pp. 429-430.) The Court of Appeal affirmed summary judgment against her on the ground of claim preclusion. (*Id*. at pp. 430-433.) Applying claim preclusion would not result in any

25

manifest injustice. Assuming the continuing viability of that exception, the court stated, "[I]t is clear that any 'injustice' to appellant in this case is the direct result of her voluntary decision not to participate in or appeal the settlement in the federal class action." (*Id*. at p. 433.)

The Court of Appeal declined to exercise the manifest injustice exception in *Robert J. v. Leslie M.* (1997) 51 Cal.App.4th 1642. In an earlier action, the appellant stipulated to paternity of a child and agreed to pay child support, even though he believed he was not the father. (*Id*. at pp. 1644-1645.) Five years later, he sought a declaration of nonpaternity. (*Id*. at p. 1645.) The parties stipulated that appellant was not the biological father. (*Ibid*.) The trial court ruled that claim preclusion barred relitigating paternity, and the Court of Appeal affirmed. (*Id*. at pp. 1646, 1647.) It stated the manifest injustice and public interest exceptions "are extremely narrow and have never enjoyed wide approval or frequent application." (*Id*. at p. 1647.) Applying claim preclusion did not work a manifest injustice because at issue was the child's best interest, and reversing would deprive the child of financial support and sever his legal tie to the paternal grandparents who had been the primary caregivers. (*Id*. at pp. 1647-1648.) Reversal would also undermine the finality of every stipulated paternity judgment and the financial security of all similarly situated children. (*Id*. at p. 1648.)

The Court of Appeal rejected the appellant's contention that reversal would serve the ends of justice because he should not be required to support a child with whom he has no biological relation. (*Robert J. v. Leslie M., supra*, 51 Cal.App.4th at p. 1648.) The court stated, "[A]ppellant's predicament is entirely self-created. He voluntarily admitted, under penalty of perjury, that he was Ryan's legal father. Both [mother] and the State of California relied upon this judicial admission. With full knowledge of his rights, and without coercion, appellant stipulated to the entry of a judgment requiring him to pay support until Ryan reaches adulthood. That judgment is final even if its factual underpinning is erroneous." (*Ibid*.)

26

### b. Exception does not apply

From this review, it is apparent that a significant factor in determining whether to apply the manifest injustice exception to issue preclusion is whether the purported injustice is something greater than an erroneous prior decision. Assuming the continued validity of the exception under *Greenfield*, if in the rare instance applying issue preclusion would result in the inequitable administration of justice beyond the impact of an erroneously decided opinion on a party or would not further the purposes of issue preclusion, a court may decide not to apply issue preclusion.

This case, however, does not present such rare circumstances. Applying issue preclusion to the 2011 judgment will not lead to the inequitable administration of justice. The Schneiders had a full and fair opportunity to litigate the existence and scope of the easement in the 2011 action, and they chose not to appeal the decision adverse to them. The issue of the easement's existence and location was fully litigated in that action, and the same issue involving the same subject matter is present in this action. That the 2011 judgment may have misapplied *Muzio* and California easement law is not sufficient to establish a manifest injustice where the Schneiders chose not to appeal.

Applying issue preclusion will not result in the Schneiders suffering an unfair advantage as against third persons. They will suffer adversely as a result of the judgment, but so too would Lane if she is precluded from exercising her rights under the 2011 judgment. "Adverse consequences alone obviously cannot outweigh the interest in having an end to litigation." (*Carroll, supra*, 77 Cal.App.3d at p. 489.)

Also, applying issue preclusion to the 2011 judgment is consistent with the doctrine's purposes. Issue preclusion will promote judicial economy and limit the scope of further litigation regarding the existence of Lane's easement should it be partially destroyed again. It will also prevent inconsistent judgments on this issue which could compromise the integrity of the judicial system in the public's view.

27

The Schneiders argue that continuing to apply *Muzio* and the 2011 judgment clouds title to their entire parcel and effectively grants Lane a perpetually floating easement over the entire servient tenement. Easements not specifically defined as to their location by the creating conveyance are commonly known as floating easements. (*Southern Cal. Edison Co. v. Severns* (2019) 39 Cal.App.5th 815, 823.) Such easements are valid and enforceable by their holders. (*Ibid*.) A floating easement " 'entitles the holder to choose a "reasonable" location and to use such portion of the servient tenement as may be reasonably necessary for the purposes for which the easement was created. The use actually made by the holder over a period of time fixes the location and the nature and extent of the use.' " (*Ibid*.) The right cannot be exercised over the entire tenement, " 'but until the easement is located, it is a cloud on the title to all of the property.' (6 Miller & Starr, [Cal. Real Estate (4th ed. 2018)] § 15:50, p. 185, fn. omitted[.])" (*Severns*, at p. 825.) Once the easement route is fixed by use, "the easement's location is no longer floating and cannot be altered without the parties' consent." (*Ibid*.)

Here, the easement is no longer floating because the trial court fixed its location as a matter of equity. Additionally, lurking in the background of this matter is the 2011 judgment's finding that without the easement, Lane's property "would have been landlocked, and an easement would have been implied by necessity." The latest destruction of the easement has not changed that fact. Neither side has briefed this issue, and we do not pursue it except to mention that this finding likely implies that, even after both flooding incidents, the Schneiders' property could be presumptively subject to Lane's access rights in the form of an easement by necessity. (See *Kellogg v. Garcia* (2002) 102 Cal.App.4th 796, 803-804 [easement of necessity may be asserted by remote grantees in the chain of title long after the easement was created by the original common grantor].) Thus, whatever cloud the 2011 judgment may cast on the Schneiders' title

when title is likely already presumptively subject to an easement of necessity is not a material injustice.

The Schneiders also contend that applying *Muzio* is contrary to the 2011 judgment's statement that the easement is subject to all rights and obligations that the declaration of the easement entails under law. This is just another argument that the 2011 judgment's reliance on *Muzio* was legally incorrect. If that is the case, the Schneiders should have appealed that judgment.

The Schneiders assert that applying *Muzio* is contrary to the trial court's statement that the parties would be back to "square one" if the 2011 easement was destroyed. There is no indication in the record that by its statement, the trial court was ruling it would reconsider the existence of the easement if it was destroyed again. The court was saying it would reconsider the easement's location if it was destroyed again, and if the servient tenement could not accommodate it, the parties would be back to their original contentions over whether the easement should be located on repaired land that fell into the floodplain. This is not a manifest injustice.

We thus conclude the manifest injustice exception to issue preclusion does not apply in this matter. Because issue preclusion applied, the trial court did not err when it determined the 2011 judgment precluded further litigation on its determination that Lane's easement attached to the Schneiders' entire parcel and that it survived its partial destruction. The court correctly denied the Schneiders' motion for summary judgment on this issue and correctly granted Lane's motion.

II

*The Cross Motions for Summary Judgment*

The Schneiders contend that even if issue preclusion applies in this matter, Lane's motion for summary judgment still should have been denied and their motion should have been granted. They assert the 2011 judgment declared that the easement was

29

subject to all rights and obligations applicable under the law, but California law does not permit relocating an easement without the servient owner's consent. The 2011 judgment, however, established that Lane's easement burdened the entire servient tenement and that a court in equity could enforce that right by declaring the easement's new location if the servient owner did not consent. The Schneiders should have appealed that decision had it disagreed with the trial court's ruling.

The Schneiders also assert that their cause of action for declaratory relief should not have been dismissed as it alleged the parties' competing claims under the 2011 judgment and the need to resolve those claims. But once the court determined the Schneiders' claims were barred by issue preclusion, the only controversies that remained to be resolved were those the court resolved at trial. The court did not err in not granting the Schneiders' motion for summary judgment.

LANE'S APPEAL

I

*Duty to Maintain Easement Under Section 845*

Section 845 states, "The owner of any easement in the nature of a private right-of-way, or of any land to which any such easement is attached, shall maintain it in repair." (§ 845, subd. (a).) The trial court determined that Lane was responsible under this statute for maintaining the easement, and that her obligation included paying for a riverbank stabilization project to protect the easement from further erosion. The court stated, "Under the clear language of the statute, the easement as now located is attached to the riverbank. As such, the obligation to maintain the easement in repair includes the riverbank to the extent and to those portions it is attached to."

The trial court's understanding of the term "attached" as it is used in section 845 is inconsistent with the long-settled understanding that the land to which an appurtenant easement is attached is the dominant tenement, which in this instance is Lane's property.

30

(*Cushman v. Davis* (1978) 80 Cal.App.3d 731, 735; § 803.)  Section 845 requires Lane to "maintain [the easement] in repair" because the easement is attached to her property.

The trial court's interpretation of a statute, however, is an issue of law we review de novo.  (*United Riggers & Erectors, Inc. v. Coast Iron & Steel Co.* (2018) 4 Cal.5th 1082, 1089 (*United Riggers*).)  If the judgment is correct on any theory, we will affirm it regardless of the court's reasoning.  (*Young v. California Fish & Game Com.* (2018) 24 Cal.App.5th 1178, 1192-1193.)

The issue before us, then, and which the parties have briefed is whether Lane's duty to "maintain [the easement] in repair" under section 845 obligates her to stabilize the riverbank against the known risk of further erosion where the riverbank is located on the servient tenement some 30 to 50 feet away from the easement's access route.  No published California case addresses this issue.

Lane argues the duty to maintain an easement in repair under section 845 does not include making major capital improvements.  To repair means to preserve the property in its original condition, not to create something new, " 'to restore to a sound state something which has become partially dilapidated, not to create something which has no existence.' "  (*Holland v. Braun* (1956) 139 Cal.App.2d 626, 632 (*Holland*).)  By contrast, an improvement is "an 'addition to or betterment of real property that enhances its capital value . . . and is designed to make the property more useful or valuable.' "  (*Keller v. Chowchilla Water Dist.* (2000) 80 Cal.App.4th 1006, 1013, quoting Webster's Third New Internat. Dict. (1986), p. 1138.)  Lane contends that stabilizing the riverbank would be a substantial improvement project, not maintenance.

Lane admits that some types of work "to preserve an asset from failure or decline" may be classified as maintenance, but it would depend not only on the work's purpose but also its nature and the scale of the project.  She asserts, as an example, there is a significant difference between applying a coat of paint to protect a structure from wind and rain and constructing a million-dollar riverbank stabilization project.  Lane cites to

31

landlord-tenant law for guidance, where a tenant's obligation to repair does not include an obligation to rebuild or replace. (See *ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1273-1274.) She also relies on generally accepted accounting principles that define a capital improvement as a major expenditure that extends the life of the asset. She argues consistent with these authorities that because stabilizing the riverbank is a major capital improvement, it is not maintenance for purposes of section 845.

The Schneiders, arguing in favor of the trial court's decision, contend that Lane's duty under section 845 to "maintain [the easement] in repair" obligates Lane to take action to protect the easement against the known risk of erosion of the riverbank. Attempting to give the words "maintain" and "repair" their ordinary meaning, the Schneiders quote from the Merriam Webster dictionary, which defines "maintain" as "to keep in an existing state (as of repair, efficiency, or validity): preserve from failure or decline," (https://perma.cc/B7KP-QXCK as of Nov. 22, 2024), and defines "repair" as "to restore by replacing a part or putting together what is torn or broken: FIX." (https://perma.cc/5Z4B-6TMZ as of Nov. 22, 2024.) Relying on these definitions, the Schneiders contend that section 845 obligates Lane to " 'preserve (her access road) from failure' and to 'restore' it in the event [it] is damaged."

When we interpret a statute, our role is to ascertain and effectuate the intended legislative purpose. (*United Riggers, supra*, 4 Cal.5th at p. 1089.) We begin with the text, giving it a plain and commonsense meaning, construing words in their broader statutory context and, where possible, harmonizing provisions concerning the same subject. (*Ibid.*; *City of San Jose v. Superior Court* (2017) 2 Cal.5th 608, 616.) If this contextual reading of the statute's language reveals no ambiguity, we need not refer to extrinsic sources and must generally follow the language's plain meaning unless a literal interpretation would result in unintended absurd consequences. (*United Riggers*, at p. 1089; *City of San Jose*, at p. 616.) If the statutory language permits more than one

reasonable interpretation, we may consider other aids, such as the statute's purpose, legislative history, and public policy. (*City of San Jose*, at pp. 616-617.)

We first define the statutory phrase "maintain it in repair." To us, the phrase's commonsense meaning is to keep up and preserve the easement in good and sound condition. To "maintain" the easement in good and sound condition expresses the same meaning. Dictionaries variously define the verb "maintain" as "to keep in a state of repair, efficiency, or validity: preserve from failure or decline" (https://perma.cc/R7VV-4995 as of Nov. 22, 2024); "[t]o keep up, preserve, cause to continue in being (a state of things, a condition, an activity, etc.); to keep vigorous, effective, or unimpaired; to guard from loss or deterioration" (https://perma.cc/5HU5-UMZ4 as of Nov. 22, 2024); and "[t]o care for (property) for purposes of operational productivity or appearance; to engage in general repair and upkeep." (Black's Law Dict. (12th ed. 2024), maintain.)

Dictionaries define the word "repair" when used as a noun, such as "in repair" in section 845, as a "relative condition with respect to soundness or need of repairing . . . the state of being in good or sound condition" (https://perma.cc/Q4N3-EAJT as Nov. 22, 2024); "[c]ondition, state. Chiefly in good (bad, excellent, etc.) repair" (https://perma.cc/25UJ-ZMBC as of Nov. 22, 2024); and "[t]he condition of something after being used or fixed; esp., the quality or state of being in good or sound condition." (Black's Law Dict., *supra*, repair.) Our interpretation of "maintain it in repair" as meaning to maintain or keep up and preserve the easement in good and sound condition accords with these definitions.

This interpretation of the phrase is also consistent with section 845's broader statutory context. Section 845 appears in a chapter of the Civil Code that concerns obligations of certain owners of real or immovable property. (Division 2, part 2, title 3, chapter 2 of the Civil Code.) Section 840 in that chapter requires an owner of a life estate to "keep the buildings and fences in repair from ordinary waste." (§ 840.) Our

33

interpretation of "in repair" in section 845 is consistent with the term's usage in section 840.

Section 841 presumes that adjoining landowners are equally responsible "for the reasonable costs of construction, maintenance, or necessary replacement" of a fence dividing their properties; the statute consistently lists construction and maintenance separately. (§ 841, subd. (b)(1), (2), (3), (4).) Our interpretation of "maintain" in section 845 as referring to general upkeep is consistent with section 841's distinction between construction and maintenance. Nothing in these statutes contradicts interpreting section 845's "maintain it in repair" phase as meaning maintaining or keeping up and preserving the easement in good and sound condition.

Because our commonsense and contextual reading of the phrase "maintain it in repair" is not ambiguous, we need not refer to other interpretative aids. Nor does this interpretation lead to absurd or unintended results. We thus will follow the interpretation and determine whether section 845's duty on Lane to keep up and preserve her easement in good and sound condition required her also to improve the adjoining riverbank to protect her easement.

Applying our interpretation, it becomes apparent that requiring Lane to construct riverbank improvements on the servient tenement some 30 to 50 feet away from her easement route obligates her to do more than keep and preserve her easement in good condition. It requires her to construct a new improvement. Admittedly, the improvement will benefit and protect her easement as well as the servient tenement, but constructing an improvement apart from the easement for protection is not maintaining the easement in good repair and is outside the duty imposed by section 845.

The Court of Appeal in *Holland, supra*, 139 Cal.App.2d 626, similarly interpreted section 845 to apply to maintenance and repairs but not improvements. In that matter, to comply with a condition for obtaining building permits, some of the owners of a private easement that ran over a dirt road, cut trees, installed culverts, regraded the roadway,

34

widened it, and paved it.  (*Id*. at pp. 628, 631-632.)  The owners brought an action to compel the non-contributing owners to pay their proportionate share of the work's costs under section 845.  (*Id*. at p. 629.)  The Court of Appeal ruled that paving the dirt road was not " 'maintaining it in repair,' " and thus section 845 did not apply.  (*Id*. at p. 633.)

The *Holland* court stated, " 'The word "repair" in its ordinary sense relates to the preservation of property in its original condition, and does not carry the connotation that a new thing should be made or a distinct entity created. . . .  "To repair means to mend an old thing, not to make a new thing; to restore to a sound state something which has become partially dilapidated, not to create something which has no existence." ' " (*Holland, supra*, 139 Cal.App.2d at p. 632, quoting *Whalen v. Ruiz* (1953) 40 Cal.2d 294, 300.)  " 'It would be in violation of a proper construction of the term "repair" to hold that it included an original improvement of the street, or work of a different character from that previously done thereon.' " (*Holland*, at p. 632, quoting *Santa Cruz Rock Pavement Co. v. Broderick* (1896) 113 Cal. 628, 633; see *McManus v. Sequoyah Land Asso.* (1966) 240 Cal.App.2d 348, 355-356 [absent contrary contractual obligations, owner of easement cannot be compelled to contribute to cost of major improvements the servient tenement owner made to easement].)

*Holland* is consistent with our interpretation of section 845.  The statute requires the dominant tenement owner to maintain an easement in good repair, but it does not compel that owner to construct or pay for major improvements that were not part of the original improvement but would benefit the easement.  We thus disagree with the trial court's and the Schneiders' interpretations of the statute as requiring Lane to preserve her access road from failure due to erosion by stabilizing the riverbank.

The Schneiders argue that expert testimony at trial defined "maintenance" and repair as fixing damage to a road caused by an eroding riverbank.  The experts, however, did not agree on what constituted maintenance.  The Schneiders' expert witness, Tom Leroy, an engineering geologist, testified that in his opinion, there are two types of road

maintenance. "One is to maintain the surface of the road in a good driving condition. So that would be similar to like repairing potholes or you know re-rocking your road once in a while if it starts to exhibit rutting or gullying. [¶] The second part of the maintenance would be to protect the alignment of the road or maintain the road in its location." Asked what would threaten a road's location, Leroy stated an example "would be an eroding riverbank such as what we are looking at in this situation."

Lane's expert, James Fitzgerald, also an engineering geologist, testified that construction, maintenance, and repair were different from each other. Building and upgrading a road were construction. Fitzgerald said there were established categories of work: three levels of maintenance (Class 1, 2, and 3), repair, and upgrade. "Maintaining a road does not involve major capital improvements, so it would be getting rid of potholes, adding rock to the road surface so people can see where they are driving." Repair was different from maintenance. Fixing damage to a road caused by erosion from an adjacent water course was repair, not maintenance.

It appears that neither expert was asked whether constructing a separate improvement such as a riverbank stabilization project to protect the road was maintenance. Nonetheless, we believe the distinctions drawn by Fitzgerald better reflect the commonsense meaning of the phrase "maintain it in repair" as used in section 845. Maintenance may include making certain repairs to a road, but constructing a separate improvement away from the road to protect the road would be construction, not maintenance or repair for purposes of section 845.

The Schneiders cite *Reclamation Dist. No. 535 v. Clark* (1909) 155 Cal. 345 (*Clark*), for the proposition that it is the purpose of the work and not its scope or cost that determines whether the work is to improve an easement or maintain an easement. *Clark*, however, is unhelpful. In that case, the board of trustees of a reclamation district sought to enforce an assessment to pay for the repair of 1,500 feet of a levee that was washed out. (*Id*. at p. 347.) By statute, the district could assess an additional assessment and

36

have the work performed under its previously approved reclamation plan without receiving prior approval from the board of supervisors if the original assessment was insufficient to pay for the repair and an additional assessment was " 'required to provide for the protection, maintenance, and repair of the reclamation works.' " (*Id*. at p. 348.) A landowner contended the work was not mere repair but was a new and unexpected contingency that required prior approval by the board of supervisors. (*Id*. at pp. 347-348.) The California Supreme Court ruled that the project was a repair. The mere fact that the break in the levy was so large did not remove it from the category of repairs. Because the sorts of repairs required upon reclamation works were frequently extensive and arose under pressing emergencies, the trustees' authority to repair without board approval had to be quite broad. (*Id*. at p. 349.)

*Clark* says nothing about whether a district's authority to repair a levee without prior approval included the authority or duty to construct some other type of improvement separate and apart from the levee to protect it against potential future harm. To repair something is to fix something that is broken, "to restore by replacing a part or putting together what is torn or broken." (https://perma.cc/Q4N3-EAJT as of Nov. 22, 2024.) Constructing a new improvement to protect a relocated easement that is presently not broken is not repair or maintenance. *Clark* does not help us interpret section 845.

The Schneiders' reliance on other authorities is also misplaced. In *Dolnikov v. Ekizian* (2013) 222 Cal.App.4th 419, the Court of Appeal held that the owner of an access easement had the *right* as part of her secondary easement rights to grade and erect a retaining wall on the servient tenement to prevent that land from eroding onto the easement roadway. (*Id*. at pp. 428-430.) The case did not concern whether the dominant tenement had a *duty* under section 845 to construct an improvement on the servient tenement to protect the easement from potential damage.

Similarly, the Court of Appeal in *Zimmerman v. Young* (1946) 74 Cal.App.2d 623, held that an owner of a right-of-way easement was entitled to cut and grade the easement

37

for a road.  "The right to use the property for road purposes carried with it a right to make necessary and reasonable improvements for the purpose for which it was intended to be used."  (*Id*. at p. 628.)  The case before us, however, does not concern whether Lane had a right to construct the riverbank stabilization improvement.

The Schneiders assert that the holding in *Holland* actually supports their argument because it confirmed that the word "repair" related " 'to the preservation of property in its original condition . . . .' "  But the Schneiders quote the sentence selectively.  The entire sentence from *Holland* reads:  " 'The word "repair" in its ordinary sense relates to the preservation of property in its original condition, and does not carry the connotation that a new thing should be made or a distinct entity created.' "  (*Ibid*.)  It does not follow from this sentence that constructing a new improvement away from the easement to protect the easement in its original condition constitutes maintenance or repair.

We thus conclude that section 845's imposition of a duty on easement owners to maintain their easements in good and sound condition does not include a duty on Lane to construct a riverbank stabilization project separate from the right-of-way to protect the relocated easement from the risk of future erosion of the riverbank.

II

*Preclusive Effect of the 2011 Judgment*

Lane contends the trial court erred by not giving the 2011 judgment preclusive effect.  She asserts the 2011 judgment established her right to relocate her access easement to multiple locations on the Schneiders' property if necessary if her designated easement is destroyed.  She also claims the 2011 judgment established that she is not responsible for stabilizing the riverbank.  She argues the trial court erred by not giving those purported findings preclusive effect and by determining her relocation right is limited and she is responsible to repair the riverbank.  Because we have determined the court erred by obligating Lane to construct a riverbank stabilization project under section

38

845, we need address only Lane's contention that the court erred by not giving preclusive effect to the 2011 judgment's purported ruling of entitlement to relocate the easement multiple times.

A.    Background

At trial, Lane argued that she needed "a safe route," one that was safe for her and for emergency use. The route needed to be in a place so that if the Schneiders determined to stabilize the riverbank, which Lane asserted was their responsibility, the project could occur without ripping out her new road. It did not matter to Lane if the Schneiders chose not to stabilize the riverbank because "[s]o long as there is Schneider property to cross, Lane has a right to cross it. Otherwise she would be landlocked and otherwise that would violate the 2011 court decision . . . ."

Lane argued that the 2011 judgment effectively held that "so long as there is Schneider land to cross, Lane can cross it. She should do so in a location that is safe and minimally impacts the Schneiders to be sure. [¶] . . . [¶] The route could be located anywhere there are viable alternative routes." Asserting *Muzio* was squarely on point, Lane argued, "Lane has a right to cross Schneider property and even though the route was destroyed by the river, she retains that right. So long as there is Schneider property upon which that right can operate, a new route can be designated." Lane asked the court to designate the most inland alternative route as the easement's new location, arguing that route would last a long time and be safe for her to drive.

The trial court agreed to designate a new access route, but it disagreed with Lane's understanding of the scope of her right to a new route. The court stated, "[Lane] has requested an order for an easement location route that is safe and least restrictive for her. No legal authority is cited for either of those propositions. The evidence at Trial indicated it is not unlikely that without maintenance and repair along the riverbank, that portion of [the Schneiders'] property could erode further in the future, again impacting

39

her easement.  [Lane's] argument, pursuant to *Muzio*, is that as long as there is land available on the servient tenement, her easement, as the dominant tenement, may be moved, ad infinitum.  This Court disagrees with that conclusion, and finds no case law authority for the proposition that an easement for ingress and egress may keep being moved *with no consideration to the owners of the* [*servient*] *tenement*."  (Italics added.)

In selecting the easement's new location, the trial court did not merely look for any viable alternative route.  It sought to balance the parties' interests and "impose as slight of burden as possible" on the servient tenement.  It determined the permissive route best met that standard.  It further stated, "Because this route has the most de minimis impact on the [Schneiders'] real property in light of prior easement locations and licenses, the Court declines to award any compensation of lost land.  It would note that any of the other proposed locations would likely entitle the [Schneiders] to such compensation."

B.     Analysis

Lane contends the trial court ignored the 2011 judgment's preclusive effect on her right to have the easement relocated.  Under *Muzio*, the 2011 court ruled that her right to an easement survived if there was anything remaining of the servient tenement upon which the easement may operate.  Lane acknowledges the court had to balance the interests of the dominant and servient tenement owners.  But she claims the court rejected her right under the 2011 judgment to be able to relocate her easement whenever it is lost so long as there is land available on the servient tenement.  She asserts the court actually disagreed with the 2011 judgment and adopted the Schneiders' argument that res judicata does not apply because it would be unjust to subject the Schneiders to multiple relocations "ad infinitum" and because the 2011 judgment is wrong on the law.

Lane's argument reads more into the trial court's decision and the 2011 judgment than is actually there.  There can be no debate, and the trial court so acknowledged, that

40

the doctrine of issue preclusion precluded the court from reconsidering whether Lane was entitled to have her easement relocated. Indeed, the court did exactly what issue preclusion required it to do—it declared the easement's new location. Thus, the court did not reject Lane's right to have the easement relocated when it was destroyed.

The trial court also did not prevent subsequent courts from relocating the easement should it be destroyed again. Nowhere in its decision did the court preclude future courts from relocating the easement on the servient tenement if the requirements and standards for doing so were met. Although the court described Lane's argument as a right to relocate "ad infinitum," it is apparent from context that the court was responding to Lane's assertion that she was entitled to have the easement relocated any time it was destroyed merely if other land was available on the servient tenement.

The trial court refused to relocate the easement merely on the basis of the availability of land on the servient tenement. The court went beyond looking just for available land by also considering the Schneiders' interests and imposing as slight a burden as possible on the servient tenement. The court further held that any other easement route proposed by Lane would have required compensation.

Lane accepts that an "implicit caveat" in *Muzio's* "anything remaining" upon the servient tenement formulation "is that any relocation must balance the interests of the dominant and servient tenement owners. Lane is not entitled to bulldoze the Schneiders' house to make a path for her easement." But Lane offers no other standard by which the trial court or any future trial court must determine where and under what conditions to locate the easement, and thus implicitly argues that under the 2011 judgment and its acceptance of *Muzio*, the trial court was, and future courts are, precluded from considering factors other than mere availability of land, or at least precluded from conditioning availability on imposing as slight a burden as possible on the servient tenement or the payment of compensation.

41

We do not read the 2011 judgment and its reliance on *Muzio* as restricting a future trial court's discretion to such an extent. The *Muzio* dicta, that an easement survives the partial destruction of the servient tenement where there is anything remaining upon which the easement may operate, does not overrule the longstanding common law doctrine that "the owner of the dominant tenement must use his or her easements and rights in such a way as to impose as slight a burden as possible on the servient tenement." (*Scruby v. Grapevine, Inc.* (1995) 37 Cal.App.4th 697, 702.) "No authority need be cited for the well-known rule that the owner of a dominant tenement must use his easement and rights in such a way as to impose as slight a burden as possible on the servient tenement." (*Baker v. Pierce* (1950) 100 Cal.App.2d 224, 226; *Locklin v. City of Lafayette* (1994) 7 Cal.4th 327, 356, fn. 17.)

This is likely why the 2011 court stated at oral argument that if the easement was destroyed again, the parties could be back to "square one." The court stated that if the easement was destroyed, the court, following *Muzio*, would ask "whether there is any more land on the servient tenement that would suffice[.]" If there was not, "maybe it would be back to square one and thinking about relocating an access down in the wetlands[.]" The court did not think "we're there yet" because it was able to locate the easement along the riverbank, an area that burdened the servient tenement as slightly as possible.

Indeed, *Muzio* cannot be raised as contrary authority to the rule requiring the easement burden the servient tenement as slight as possible because the issue of balancing the servient tenement's interest was not considered in that case. In that matter, the servient tenement had been completely destroyed. (*Muzio, supra*, 41 Cal.App. at pp. 416-417.) Reported opinions are not authority for issues they did not consider and decide. (*Marriage of Cornejo* (1996) 13 Cal.4th 381, 388.)

Contrary to Lane's claim, the trial court did not disregard the 2011 judgment and *Muzio*. As a result of issue preclusion, the rule of *Muzio* as adopted by the 2011

42

judgment is binding on the parties. But nothing in that rule eliminates the court's discretion, and duty, to ensure that any new easement location on available land imposes as slight a burden as possible on the servient tenement and to require compensation as a matter of equity if any additional burden is imposed. (*See Hirshfield v Schwartz* (2001) 91 Cal.App.4th 749, 770-772 [court sitting in equity did not abuse its discretion by granting encroachment owners an equitable easement in the disputed land and requiring them to pay compensation].)

Because we conclude issue preclusion applies and that the doctrine did not preclude the trial court from burdening the servient tenement as little as possible, we do not address Lane's arguments regarding equitable easements.

III

*Discretion in Selecting the Easement's Location*

Lane contends the trial court abused its discretion by selecting the permissive route as the easement's location. She asserts the permissive route was the route most likely to fail in the future. Lane argues that combining that fact with the court's error in imposing on Lane the obligation to construct a riverbank stabilization project under section 845 shows the court abused its discretion in selecting the permissive route and not the next closest inland route proposed by Lane.

Additionally, Lane asks us to designate one of the two most inland routes as the easement route.

A.      Background

Lane's property consists of a landlocked single-family residence with access only through the Schneiders' property. The Schneiders' property consists of a horse pasture and meadow through which the permissive route runs, their veterinary clinic, residence, outdoor bedroom, chicken coop and yard, and other outbuildings and improvements.

43

Lane proposed three alternate routes for the easement's location. Route 1 was the farthest inland route. It traversed the east side of the Schneiders' property and looped around the north end of the Schneiders' residence and compound and west over to Lane's residence. This route would require building a new road with tree removal, earth moving, and the removal or intrusion of some of the Schneider compound's infrastructure.

Route 2 left the county road south of the Schneiders' compound but just north of their veterinary office, and it ran west across the meadow until reaching Lane's property. The trial court stated this route would "go through the curtilage of the veterinary office," over a septic tank and leach fields, and through existing fencing. There was testimony at trial that a road could be placed over a septic tank but not over the current leach field location.

Route 3 left the county road south of the veterinary office, ran northwest to the meadow and then west to Lane's property. This route largely followed the permissive route through the Schneiders' pasture except it left the county road farther inland.

Lane testified she would feel most safe driving routes 1 or 2 and did not feel safe driving route 3. Expert testimony was that route 3 was currently safe but given the unknown nature of the river's flow and potential elevated water levels, further erosion of the riverbank was possible.

The court balanced the interests of both parties, and as stated earlier, to impose as slight a burden as possible on the servient tenement, it selected the permissive route as the easement route location. Because this route had "the most de minimis impact on the [Schneiders'] real property in light of prior easement locations and licenses," the court declined to award the Schneiders' compensation for lost land.

B.    Analysis

Lane claims the trial court abused its discretion by not selecting route 3. She asserts that in balancing hardships, the dominant tenement owner had a legitimate interest

in avoiding significant costs, and the servient tenement owner was not entitled to be free of all burdens or inconvenience. Lane argues the court abused its discretion by locating the easement on the permissive route—the route most likely to fail—and also imposing on Lane the sole obligation to stabilize the riverbank at great cost to her. Route 3 was a safer route and created little to no hardship on the Schneiders. Lane additionally asks us to declare the easement location and to select either routes 1 or 2.

We will not disturb a trial court's exercise of discretion unless it results in a miscarriage of justice. (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.) " '[O]ne of the essential attributes of abuse of discretion is that it must clearly appear to effect injustice. [Citations.] Discretion is abused whenever, in its exercise, the court exceeds the bounds of reason, all of the circumstances before it being considered. The burden is on the party complaining to establish an abuse of discretion, and unless a clear case of abuse is shown and unless there has been a miscarriage of justice a reviewing court will not substitute its opinion and thereby divest the trial court of its discretionary power.' " (*Ibid*.) We resolve all evidentiary conflicts in favor of the judgment and determine whether the court's decision " ' "falls within the permissible range of options set by the legal criteria." ' " (*Hirshfield v. Schwartz, supra*, 91 Cal.App.4th at p. 771.)

No miscarriage of justice occurred here. The trial court acted well within its discretion when it selected an easement route that would provide Lane access to her property but also minimally impact the Schneiders' interests. It viewed the property and considered the expert testimony. It found that each alternative created progressively more significant impacts on the Schneiders' interests, and it selected the route that would protect those interests while still allowing Lane access to her property.

Nor will we substitute our opinion for the trial court's and divest it of its discretionary power by selecting an alternate route. The trial court did not abuse its discretion in selecting the permissive route as the easement route.

DISPOSITION

The judgment is reversed to the extent it obligated Lane to stabilize the riverbank under section 845. In all other respects, the judgment is affirmed.

The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3).)

_____

HULL, Acting P. J.

We concur:

_____

KRAUSE, J.

_____

MESIWALA, J.